# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-31269

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JABORI HUNTSBERRY,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2020

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Louisiana

Before HIGGINBOTHAM, JONES, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Jabori Huntsberry challenges his convictions for various drug offenses and for possessing firearms as a convicted felon. Huntsberry claims the district court should have severed the felon-in-possession charge from the drug charges. He also claims the trial evidence was insufficient to support the felon-in-possession conviction, both as to his knowing possession of the firearms and his knowledge of his status as a convicted felon. We affirm.

I.

Because Huntsberry's appeal turns on the sufficiency and strength of the evidence presented against him at trial, we begin by comprehensively recounting that evidence.

No. 18-31269

On December 14, 2017, Huntsberry was indicted for conspiracy to possess with intent to distribute marijuana, unlawful use of a communication facility, possession with intent to distribute approximately two pounds of marijuana, and for possessing a firearm as a convicted felon. His mother, Nanette Huntsberry ("Nanette"), was also indicted on the first three counts— everything but the firearms count. Prior to trial, Huntsberry moved to sever the firearms count from the drug counts, arguing that admission of his prior felony conviction would prompt the jury to see him as a "bad person." The district court denied the motion.

Huntsberry and Nanette proceeded to a joint jury trial. Before the Government presented its case-in-chief, the parties stipulated that Huntsberry was convicted of a felony in 2003 in Louisiana's 15th Judicial District Court, and had never applied for or received a pardon.

The Government's first witness, U.S. Postal Inspector Augustus Magee, testified that drug traffickers frequently use the U.S. Mail—in particular, Express Mail packages—to transport drugs. Magee explained that inspectors look for packages originating from a source city or state (noting California as an example), handwritten mailing labels, signature waivers, and the use of vacant or nonexistent return addresses.

Magee testified that the case at hand began in July 2013, during one of his routine reviews of packages at a postal center in Lafayette, Louisiana. That day, two packages from Fresno, California, bearing handwritten labels, caught his attention. Both were addressed to "N. Huntsberry," with one package listing P.O. Box 61711 in Lafayette as the recipient's address and the other listing 5623 Albert Road in Abbeville, Louisiana. Magee discovered that P.O. Box 61711 was rented earlier that year by Nanette, whose home address was 5629 Albert Road in Abbeville. Magee then learned from the carrier for the

2

No. 18-31269

area that Jabori Huntsberry resided in a mobile home at 5623 Albert Road, next door to his mother.

Continuing to investigate, on November 6, 2013, Magee located a similarly suspicious package at a Baton Rouge postal center. That package had been sent by Express Mail from "Debra Anthony" in Fresno, bore a handwritten label addressed to "Nakendra Moore"[1] at P.O. Box 2053 in Abbeville, and had a nonexistent return address. Magee learned that Huntsberry and Nanette had access to P.O. Box 2053. He confiscated the suspicious package and presented it to a drug detection dog, which gave a positive alert. Magee then obtained a search warrant for the package and found inside 80 oxycodone tablets, 159 hydrocodone tablets, and approximately two pounds of marijuana. Magee next conducted a "label review" and discovered that the same sender, Debra Anthony, had also mailed a package to Nanette's P.O. Box 61711 in Lafayette on the same date as the drug package that was mailed to Moore's P.O. Box 2053 in Abbeville. He noted the handwriting on the two mailing labels was very similar and the tracking numbers for the two packages were sequential.

Magee testified that additional suspicious packages from California arrived at the Abbeville post office on November 12, 15, and 20, 2013. On each of those dates, Magee contacted Sergeant Elliot Broussard of the Vermilion Parish Sheriff's Office to conduct surveillance, and Magee obtained video footage from inside the post office to see who retrieved the packages from P.O. Box 2053. The surveillance revealed that Huntsberry retrieved the November 12 package, Nakendra Moore retrieved the November 15 package, and Nanette

---

[1] Nakendra Moore turns out to be Ivan Ardoin's longtime girlfriend, and the mother of Ardoin's three children. Ardoin, in turn, is Huntsberry's cousin. Ardoin also identified himself as Nanette's cousin.

3

No. 18-31269

retrieved the November 20 package. On each occasion, the person who picked up the package traveled directly from the post office to 515 South Lamar Street in Abbeville, the residence where Moore and her longtime boyfriend Ivan Ardoin lived together. Another suspicious package also arrived on November 20 addressed to Nanette's residence; surveillance revealed that Huntsberry accepted that package from the carrier and brought it into his trailer before departing for 515 South Lamar. In total, Magee reviewed 16 surveillance videos from the Abbeville post office covering August through November 2013. He related that Nanette made 10 trips to the post office to receive packages.

Over the next two months, Inspector Magee seized three other suspicious packages mailed from Fresno: a December 3, 2013 package addressed to "N. Huntsberry" at 5623 Albert Road (Huntsberry's trailer); a second December 3, 2013 package addressed to "N. Huntsberry" at Nanette's P.O. Box in Lafayette; and a February 1, 2014 package addressed to "Amazing Hair Salon" at 5623 Albert Road. Each package was presented to a drug detection dog, and after the dog alerted, Magee obtained a federal search warrant to open the package. The December 3 packages each contained between two and three pounds of marijuana. Due to time and manpower constraints, Magee did not execute the warrant on the February 1 package, and it was delivered in the ordinary course without first being opened.

Magee testified that he then decided to perform a controlled delivery of the next suspicious package. On February 14, 2014, he became aware of another Express Mail package sent from Fresno and addressed to "Amazing Hair Salon" at 5623 Albert Road. As before, a drug detection dog alerted to the package, and Magee then obtained a search warrant and opened the parcel. It contained two pounds of marijuana. In coordination with the Vermilion Parish Sheriff's Office and the Abbeville post office, Magee arranged for another postal inspector, Jon Helluin, to pose as a letter carrier and deliver the package that

4

No. 18-31269

afternoon. As part of the operation, Sergeant Broussard secured state search warrants for both Huntsberry's and Nanette's residences prior to the controlled delivery. Although the package was addressed to Huntsberry's trailer, Inspector Helluin was instructed to deliver it to the residence next door (Nanette's). Helluin later testified that around 4:00 p.m. he pulled into the driveway of 5629 Albert Road and stopped his vehicle; as he started walking toward the residence, he was met by Nanette in the driveway. Nanette signed for the package and then walked back into her house with it. Helluin then drove off.

Within minutes of learning that the controlled delivery was made, Magee, Broussard, and other local deputies executed the search warrants. Broussard was part of the entry team on the warrant for Nanette's house. From her master bathroom, the team recovered the unopened marijuana package that had just been delivered and placed Nanette under arrest. In the master bedroom, they also recovered the empty box from the February 1, 2014 package addressed to Huntsberry's trailer's address. Broussard testified that after Nanette's arrest, Huntsberry arrived and was also placed under arrest.

During the same time period, Vermilion Parish deputies executed the search warrant on Huntsberry's mobile home. Magee testified that the deputies recovered the following items: Express Mail shipping labels pertaining to packages that had originated in Fresno (including a label corresponding to the November 6, 2013 package containing tablets and marijuana); a marijuana cigarette; a "vacuum-sealed bag that was opened that contained green vegetable matter" (suspected to be marijuana); packaging equipment including a digital scale; and MoneyGram wire transfer receipts. The deputies also found what they suspected to be a drug ledger—a composition book with notes that included various dollar amounts, "narcotics lingo," and dates that corresponded with wire transfers. The notebook had

No. 18-31269

Huntsberry's name on it and contained lyrics for rap songs (subsequent testimony revealed Huntsberry was an aspiring rapper).

In searching Huntsberry's residence, the deputies also located two firearms—a Romarm AK-47 semi-automatic rifle manufactured in Romania and a Ruger 9mm pistol manufactured in Arizona—inside a closet "off of" what they took to be Huntsberry's bedroom. The Government displayed the guns in court and eventually entered them into evidence. Broussard later conceded, on cross-examination, that he was unsure whether the bedroom where the firearms were found was in fact the master bedroom. Broussard did, however, state that the room "appeared" to be the master and "appeared" to be where Huntsberry regularly slept. Broussard testified Huntsberry lived in the trailer with "his girlfriend and some children." Broussard also recalled that the alleged drug ledger and the mailing labels were found "kind of together" in "the bedroom to the right." Broussard did not indicate whether this was the same bedroom in which the guns were found. Broussard admitted that no photographs were taken of where the firearms, drug ledger, and shipping labels were found inside the trailer. On redirect, he explained that "firearms are not depicted in their natural state generally for officer safety."

As part of the investigation, officers also obtained records from MoneyGram and Western Union. Broussard testified that his review of those records showed that between October 2011 and February 2014, Huntsberry, Nanette, Moore, Ardoin, and various others wired a total of $299,000 to California. Of that amount, Huntsberry made 40 wire transfers totaling approximately $60,000, and Nanette made 42 transfers totaling $64,000. Broussard and Magee also observed a "send and receive" pattern whereby a wire transfer of between $1,000 and $2,500 was made and packages arrived two or three days later. Magee additionally testified that between March 2013 and February 2014, a total of 95 "suspected drug packages" from California

6

were mailed to Huntsberry's address, Nanette's address, Nanette's P.O. Box in Lafayette, or Moore's P.O. Box in Abbeville. Four of these packages were the ones Magee opened after obtaining search warrants. No suspected drug packages were shipped to any of these addresses after Nanette and Huntsberry were arrested.

Nakendra Moore also testified for the Government at trial. She explained that in 2011 Huntsberry and Ardoin requested she rent a P.O. box in her name for Huntsberry's use. Moore complied, applying for and securing P.O. Box 2053 in Abbeville. The post office provided Moore with two keys for the box; she kept one for herself and gave one to Huntsberry. Moore denied ever giving a key to Nanette, and did not know how Nanette had gotten access to the box. Additionally, Moore testified that, at the time she applied for the P.O. Box, she believed Huntsberry planned to use it in connection with his rap music endeavors.

With respect to the packages sent to P.O. Box 2053, Moore testified that Huntsberry would advise her when a package needed to be picked up at the post office, and she would do it. Moore indicated that these packages would have her name and P.O. Box number on the address label, not Huntsberry's. After picking up the packages, Moore would bring them to her and Ardoin's house at 515 South Lamar. Sometimes, Moore testified, Huntsberry would be waiting there for her when she arrived, and sometimes he would arrive later. Moore also explained that, early on, Huntsberry and Ardoin would tell her to leave before they opened the packages; however, one day she happened to see that a package contained marijuana, and thereafter the packages were sometimes opened in front of her.

Moore also confirmed that Nanette sometimes brought packages to her house on South Lamar Street; Nanette would give the unopened packages to Huntsberry or Ardoin and then leave. Moore denied ever telling Nanette that

she had discovered that the packages from California and the wire transfers pertained to marijuana trafficking.

In addition to receiving the packages, Moore related that she sent wire transfers, typically by MoneyGram or Western Union, to California at Huntsberry's request. She explained that for each transaction, Huntsberry supplied her with money in an amount between $1,500 and $2,000. Moore confirmed that she sent more than 50 wire transfers, totaling over $80,000, on behalf of Huntsberry. In addition, Huntsberry used Moore's mother to send money to California by wire transfer. Moore admitted that she was convicted on state charges related to her involvement in the case and sentenced to probation.

Ivan Ardoin testified next. Regarding the AK-47 and 9mm pistol recovered from Huntsberry's trailer, Ardoin recounted that on New Year's Eve at the end of 2010 he and Moore brought the guns to Huntsberry's house to shoot them and "pop firecrackers." Ardoin explained there were "so many people out there," including Huntsberry, that he did not recall whether Huntsberry ever shot the guns. Ardoin explained "a sheriff" passed by as he was shooting the guns, so he put the guns aside and continued popping firecrackers. He testified that he left the guns on the trunk of Nanette's car and forgot about them, but admitted his memory on this point was "foggy" given his heavy marijuana usage. Ardoin also did not recall speaking to Huntsberry about the guns after he left them on the property, and he did not know what, if anything, Huntsberry had done with the guns.

As for the drugs, Ardoin testified that in 2013 Huntsberry approached him with a plan to make money by selling marijuana obtained from California. According to Ardoin, Huntsberry was a rapper and had already been distributing marijuana. Ardoin—a daily marijuana smoker at the time—

agreed to participate, hoping to obtain some marijuana for his personal use and to distribute some of the drug, which he did.

Ardoin confirmed that he and Huntsberry got together and asked Moore to obtain a post office box in her name, which she did. Packages containing approximately a pound of marijuana were then shipped to the P.O. Box once or twice a week, and Moore would pick up the packages from the post office. Ardoin and Huntsberry would split the marijuana between themselves. Ardoin related that Huntsberry sometimes also picked up packages from the P.O. Box, which he would bring to the house on South Lamar Street. Likewise, Nanette would sometimes deliver packages to the South Lamar residence; Ardoin stated that Nanette would hand Huntsberry the sealed box through her car window and then drive off. On cross-examination, Ardoin indicated that Huntsberry did not want his mother knowing what was going on regarding the packages, and he never heard anyone tell Nanette what was inside the packages.

According to Ardoin, the marijuana shipments were paid for in advance. He admitted wiring money to pay for them, adding that he would get the payee's name and address from Huntsberry. He also identified other individuals who wired funds to California on behalf of Huntsberry, including Moore, her brother Kerry, Kerry's girlfriend, and Moore's "elderly" mother. Ardoin also testified Huntsberry had traveled to California, "guess[ing]" it was to meet with the marijuana suppliers.

Ardoin averred that he stopped obtaining marijuana from Huntsberry after the two had a disagreement, about six or seven months before the arrests. At some point following the arrests, after law enforcement officers questioned Moore, Ardoin came forward and spoke to officers about his role in the drug trafficking. Investigators at that time were not aware of Ardoin's involvement, and he cooperated without any promises of leniency.

No. 18-31269

At the conclusion of the Government's case-in-chief, Huntsberry moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, asserting there was insufficient evidence to support the knowing possession element of the gun charge. The court denied the motion. The next day, the court instructed the jury not to consider Huntsberry's prior unspecified felony as evidence of guilt of the drug offenses or for any element of the gun count besides the element requiring Huntsberry to be a convicted felon. The jury found Huntsberry guilty on all counts, but acquitted Nanette across the board.

Following trial, Huntsberry renewed his motion for judgment of acquittal and moved for a new trial. The district court denied both motions in a lengthy memorandum. On December 10, 2018, Huntsberry was sentenced to 60 months of imprisonment as to Counts 1 and 3, 48 months of imprisonment as to Count 2, and 63 months of imprisonment as to Count 4, to be served concurrently, and a total of two years of supervised release.

Huntsberry timely appealed. The district court had jurisdiction under 18 U.S.C. § 3231. This court has jurisdiction under 28 U.S.C. § 1291.

II.

On appeal, Huntsberry argues that (1) his felon-in-possession conviction should be reversed because the evidence presented at trial was insufficient to establish that he knowingly possessed the firearms found in his jointly-occupied trailer; (2) his felon-in-possession conviction should also be reversed because the evidence was insufficient to show—and the jury was never instructed to find—that he knew his status as a felon at the time the guns were discovered; and (3) his drug convictions should be reversed because the district court abused its discretion in denying his motion to sever the drug counts from the gun count. We address each argument in turn.

10

No. 18-31269

A.

We first consider Huntsberry's claim that the trial evidence was insufficient to prove he knowingly possessed the firearms found in his home. We hold that a reasonable jury could plausibly infer, based on the evidence presented, that Huntsberry had knowledge of the weapons.

Where a defendant objects to the sufficiency of the evidence, as Huntsberry did here by moving for acquittal at the close of evidence and again at the end of trial, we review the challenge *de novo. United States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013). Our review is "highly deferential to the verdict," and, viewing the evidence in the light most favorable to the prosecution, we consider whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Chon*, 713 F.3d at 818 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We accept "all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict" and resolve conflicts in the evidence in favor of the verdict. *Id.* (internal quotation marks and citation omitted).[2]

To convict under 18 U.S.C. § 922(g)(1), the Government must prove: (1) the defendant was previously convicted of a felony, (2) the defendant knowingly possessed a firearm, and (3) the firearm traveled in or affected interstate commerce. *See United States v. Ferguson*, 211 F.3d 878, 885 n.4 (5th Cir. 2000). Possession of a firearm may be actual or constructive, and may be proved by circumstantial evidence. *United States v. De Leon*, 170 F.3d 494, 496 (5th Cir. 1999). "In general, a person has constructive possession if he knowingly has ownership, dominion, or control over the contraband itself or

---

[2] Our court has rejected the so-called "equipoise rule," which dictated that a conviction must be reversed "if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (cleaned up).

over the premises in which the contraband is located." *United States v. McKnight*, 953 F.2d 898, 901 (5th Cir. 1992); *see also De Leon*, 170 F.3d at 496.

"Constructive possession need not be exclusive, it may be joint with others." *McKnight*, 953 F.2d at 901. "When a residence is jointly occupied, however, a more exacting standard applies." *United States v. Meza*, 701 F.3d 411, 419 (5th Cir. 2012). In joint occupancy cases "something else (e.g., some circumstantial indicium of possession) is required besides mere joint occupancy before constructive possession is established." *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993). We will affirm a finding of constructive possession in cases of joint occupancy "only when there is some evidence supporting *at least a plausible inference that the defendant had knowledge of and access to the illegal item.*" *Meza*, 701 F.3d at 419 (quoting *United States v. Hinojosa*, 349 F.3d 200, 204 (5th Cir. 2003)). "Ultimately, the determination of whether constructive possession exists is not a scientific inquiry, and the court must employ a common sense, fact-specific approach." *Id.* at 419 (cleaned up).

Huntsberry argues that the Government failed to satisfy the "more exacting standard" set forth in *Meza* and *Mergerson* for joint occupancy cases. His theory is that the guns could have been planted in his trailer on the eve of his arrest, perhaps by Ardoin, who testified against Huntsberry at trial, and that any assumption about the guns having languished in the closet since they were left on Nanette's car four years earlier is "sheer speculation." He likens his case to *Mergerson*, where we reversed a defendant's conviction under § 922(g)(1) because "the weapon was not in plain view and there were no other circumstantial indicia that established [defendant] even knew of the weapon." 4 F.3d at 349 (footnote omitted). We find Huntsberry's argument lacking.

In *Mergerson*, federal agents discovered an inoperable handgun "between the mattress and boxsprings of the bed in a bedroom in the residence in which [defendant] occupied." *Id.* at 348. The residence had two bedrooms—

the one in which the gun was found was the only one containing adult clothing. *Id.* at 348 n.14. The defendant stipulated that he had shared the residence with his girlfriend for approximately one month before his arrest, but introduced a receipt indicating his girlfriend purchased the gun "well before" the time he moved in. *Id.* at 348. We rejected the Government's argument that "the fact that [defendant] was living in the bedroom in which the weapon was found is enough to establish constructive possession" and concluded the evidence was "constitutionally insufficient" to support a conviction. *Id.* at 349.

Here, unlike in *Mergerson*, an assault rifle and a pistol were discovered in what appeared to be the master bedroom closet in the trailer Huntsberry occupied for many years. Moreover, the Government presented evidence that the guns had been left near Huntsberry's residence four years earlier at a New Year's Eve party Huntsberry attended. Thus, the evidence included "some circumstantial indicium of possession" beyond the mere fact that the guns were found in a trailer Huntsberry occupied with his girlfriend.

To be sure, many of our cases affirming § 922(g)(1) convictions in joint occupancy settings have relied on evidence that the firearm was in plain view or was found among the defendant's personal effects. *See, e.g., McKnight*, 953 F.2d at 902 & n.4; *United States v. Fields*, 72 F.3d 1200, 1212 (5th Cir. 1996); *De Leon*, 170 F.3d at 495–97; *United States v. Fambro*, 526 F.3d 836, 840 (5th Cir. 2008); *Meza*, 701 F.3d at 421–22. However, these cases do not establish an inflexible rule that a firearm *must* be found in plain view or among the defendant's belongings to support a "plausible inference" the defendant knew

about the weapon. Here, one of the weapons was conspicuous, as the reader can see:



Ideally, the Government might have introduced evidence showing how these guns were arranged in the closet, but, in light of the other evidence presented at trial, the Government's failure to do so did not prohibit the jury from inferring that Huntsberry knew about the guns.

Taking a common-sense approach and viewing the evidence in favor of the verdict, "we conclude that the totality of the evidence presented at trial creates at least a plausible inference that [Huntsberry] had knowledge of and access to the weapon[s]." *Mudd*, 685 F.3d at 478. Therefore, Huntsberry is not entitled to reversal of his felon-in-possession conviction.

## B.

We next consider Huntsberry's claim that his felon-in-possession conviction cannot stand for another reason: because the evidence was insufficient to prove—and the jury was not instructed to find—that he knew

his status as felon when he possessed the guns. Huntsberry relies on *Rehaif v. United States*, 139 S. Ct. 2191 (2019), which held that the *mens rea* requirement in 18 U.S.C. § 924(a)(2)—"knowingly"—applies to both the "conduct" and "status" elements in § 922(g). *See* 139 S. Ct. at 2194. That is, the Government "must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it."[3] *Id.*

Huntsberry argues that because his sole prior felony—carnal knowledge of a juvenile—took place long before the current offense, was "relatively minor," and resulted only in a "probated sentence," the "possibility is quite real" that he was unaware of his status as a convicted felon. We understand Huntsberry to make two claims: (1) the Government did not adduce sufficient evidence to prove he knew he was a felon when the guns were discovered, and (2) the district court erred by failing to instruct the jury that the Government had to prove Huntsberry knew his felon status.[4] Even assuming the district

---

[3] In *Rehaif*, the defendant was convicted under § 922(g)(2), which prohibits unlawful aliens from possessing firearms, but argued at trial that he did not realize his lawful status as a nonimmigrant student had expired after he failed out of school. *Id.* at 2201 (Alito, J., dissenting). Having held the Government must show that the defendant "knew he belonged to the relevant category of persons barred from possessing a firearm," the Supreme Court remanded the case. *Id.* at 2200.

[4] Offering no response to the merits of Huntsberry's *Rehaif* argument, the Government instead argues Huntsberry waived the argument by raising it in a Rule 28(j) letter filed after the close of briefing, notwithstanding the fact that *Rehaif* itself was decided after the close of briefing. As a general rule, we do not consider arguments raised for the first time in a reply brief or 28(j) letter. *United States v. Sanchez-Villalobos*, 412 F.3d 572, 577 (5th Cir. 2005), *abrogated on other grounds by Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010). However, we have jurisdiction to review even unpreserved arguments. *See United States v. Miranda*, 248 F.3d 434, 443-44 (5th Cir. 2001). Moreover, albeit in unpublished opinions, our court has considered belated *Rehaif* claims, as have several of our sister circuits. *See, e.g., United States v. Johnson*, 781 F. App'x 370, 371 (5th Cir. 2019) (per curiam) (unpublished) (considering *Rehaif* argument raised in reply brief); *United States v. Denson*, 774 F. App'x 184 (5th Cir. 2019) (per curiam) (unpublished) (granting panel rehearing based on *Rehaif*); *United States v. Balde*, 943 F.3d 73, 88 (2d Cir. 2019) (same); *United States v. Davies*, 942 F.3d 871, 873 (8th Cir. 2019) (reversing § 922(g)(1) conviction based on *Rehaif* argument raised in 28(j) letter). We will consider the *Rehaif* claim.

court plainly erred in light of *Rehaif*, we nevertheless decline to reverse because Huntsberry has not shown a reasonable probability of a different outcome but for that error, much less that the error affected the fairness, integrity, or public reputation of judicial proceedings.

1.

At the outset, we must determine what standard of review applies to Huntsberry's *Rehaif* claims. As noted, where a defendant objects to the sufficiency of the evidence in the district court, we review sufficiency *de novo*. *Chon*, 713 F.3d at 818. When a sufficiency challenge is not preserved, we review for plain error. *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018). "[T]his court reviews jury instructions for abuse of discretion and harmless error." *United States v. Vasquez*, 677 F.3d 685, 692–93 (5th Cir. 2012) (*citing United States v. Betancourt*, 586 F.3d 303, 305 (5th Cir.2009)). "However, when a defendant fails to object to jury instructions, we review for plain error." *Id.* at 692–93.

Here, whereas Huntsberry raised a sufficiency objection to his felon-in-possession conviction in the district court, the objection targeted a different element of the charged crime: whether Huntsberry knowingly possessed the firearms, not whether he knew his felon status. "A defendant's objection must be on the specific grounds he raises on appeal." *United States v. Johnson*, 943 F.3d 214, 221–22 (5th Cir. 2019) (cleaned up); *cf. United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc) (per curiam) ("Where, as here, a defendant asserts *specific grounds* for a specific element of a specific count for a Rule 29 motion, he waives all others for that specific count.").[5] Similarly,

---

[5] Indeed, Huntsberry acknowledged in his post-trial Rule 29 motion that "the first element [of the felon-in-possession count] was met because it was stipulated that Mr. Huntsberry was convicted of a felony."

No. 18-31269

Huntsberry did not object to the jury instructions concerning the felon-in-possession count. Therefore, we review both of Huntsberry's *Rehaif* claims for plain error. Reversal is justified if there was "(1) an error, that was (2) plain, that (3) affected the defendant's substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Vasquez*, 677 F.3d at 693 (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)). "[W]e have summarized the plain-error test's application to unpreserved insufficiency claims by stating that the court will reverse only if there is a *manifest* miscarriage of justice." *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc) (internal quotation marks omitted).

2.

In light of *Rehaif*, the first two prongs of the plain error standard are easily satisfied with respect to Huntsberry's challenge to the jury instructions: The district court's failure to instruct the jury concerning Huntsberry's knowledge of his felon status was plainly erroneous. *See United States v. Benamor*, 937 F.3d 1182, 1188–89 (9th Cir. 2019) ("[T]he absence of an instruction requiring the jury to find that Defendant knew he was a felon was clear error under *Rehaif*."); *see also Henderson v. United States*, 568 U.S. 266, 279 (2013) (holding second prong of plain error review considers the law as clarified during time of appeal); *United States v. Escalante-Reyes*, 689 F.3d 415, 418 (5th Cir. 2012) (en banc) (same).

What is perhaps less clear is whether Huntsberry's unpreserved sufficiency-of-the-evidence challenge satisfies the first two plain error prongs. "[T]o satisfy the second prong of the plain-error test, [Huntsberry] must demonstrate not just that the government's evidence was . . . insufficient, but that it was *obviously* insufficient." *Delgado*, 672 F.3d at 331. At trial, Huntsberry stipulated to the *fact* of his prior felony conviction, but there was no stipulation or other evidence concerning what *Rehaif* now tells us is also

17

required: Huntsberry's *knowledge* of his status as a convicted felon at the time the guns were discovered. Still, insofar as Huntsberry admitted he was a convicted felon, it is a close question whether the evidence of his *knowledge* of his felon status at the time of the offense was "*obviously* insufficient."[6] Nevertheless, we need not resolve whether Huntsberry's sufficiency challenge satisfies the first and second prongs of the plain error test because, even if it does, neither it nor Huntsberry's challenge to the jury instructions satisfies the remaining prongs of the test.

3.

To justify reversal on plain error review, Huntsberry must show that the error affected his substantial rights. *Vasquez*, 677 F.3d at 693. "As a general rule, an error affects a defendant's substantial rights only if the error was prejudicial." *Johnson*, 943 F.3d at 223 (cleaned up). "Error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error." *Id.* The probability of a different result must be sufficient to undermine confidence in the outcome of the proceedings. *United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (*citing United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)).

As a threshold matter, we face the question of what sources of evidence we, as an appellate court, may properly consider in determining whether the district court's errors affected Huntsberry's substantial rights. More precisely: Is our substantial rights inquiry limited to the evidence admitted at trial, or

---

[6] Some unpublished decisions have diverged on whether *knowledge* of felon status can be inferred solely from a defendant's unadorned stipulation to the *fact* of a prior felony conviction. *See, e.g.*, *Johnson*, 781 F. App'x at 371 (holding defendant's "plea colloquy d[id] not establish that he knew, when he committed his present offense, that he was a convicted felon"). *But see United States v. Conley*, No. 19-5168, 2020 WL 571324, at *3 (6th Cir. Feb. 5, 2020) (unpublished) (holding "jury was entitled to infer knowledge of prohibited status . . . from [defendant]'s stipulation that he had a prior felony conviction"). Because Huntsberry fails as to the third and fourth plain error prongs, we need not address this issue.

may we also consider evidence presented at sentencing, or perhaps even evidence outside the appellate record entirely? This makes a difference because at trial the sole evidence concerning § 922(g)(1)'s status requirement was Huntsberry's stipulation: "[O]n April 1, 2003, in the 15th Judicial District Court, Vermilion Parish, Abbeville, Louisiana, the defendant, Jabori Huntsberry, was convicted of a felony offense punishable by more than one year imprisonment" and "has never applied for, nor received, a pardon for that felony offense." Only at sentencing—months after the jury rendered its guilty verdict—did the Government present evidence concerning the nature of Huntsberry's prior felony and the sentence he received, and it is that evidence that goes more directly to Huntsberry's knowledge of his felon status. *Cf. United States v. Montgomery*, No. 2:14-CR-00205, 2020 WL 1057696, at *6 (W.D. Pa. Mar. 4, 2020) ("In the end, whether [defendants] can meet the third prong comes down to what information the Court can consider during its plain error review.").

We note that our sister courts have taken different paths on this issue. Some have resolved the substantial rights inquiry based on facts about the defendant's prior convictions and sentences without discussing whether those facts were in the trial record or before the district court. *See, e.g.*, *Benamor*, 937 F.3d at 1189; *United States v. Hollingshed*, 940 F.3d 410, 415–16 (8th Cir. 2019). Others have relied on evidence introduced at sentencing—even where that evidence was never admitted at trial—on the basis that (1) the defendant failed to object to the evidence and (2) caselaw from the guilty-plea context permits courts reviewing for plain error to consult the "entire" record. *See, e.g.*, *United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019) (citing *United States v. Vonn*, 535 U.S. 55, 59 (2002)). These approaches, however, may be in tension with our precedent that "we review for plain error based on *the record before the district court.*" *United States v. Ceron*, 775 F.3d 222, 226 (5th Cir.

2014) (emphasis added). *Accord United States v. Miller*, No. 16-3734-CR, 2020 WL 1592254, at \*3 (2d Cir. Apr. 2, 2020) (stating that on substantial rights prong "we appropriately limit ourselves to the evidence actually presented to the jury" (citing *Neder v. United States*, 527 U.S. 1, 19 (1999))).

We need not resolve the issue here because, on plain error review, it is appropriate for us to judicially notice the facts of Huntsberry's prior felony conviction. We may judicially notice "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b); *see United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001) ("An appellate court may take judicial notice of facts, even if such facts were not noticed by the trial court."); *Gibson v. Blackburn*, 744 F.2d 403, 405 n.3 (5th Cir. 1984) (recognizing a court of appeals' authority to "enlarge the record to include material not before the district court"); *see also United States v. Flores*, 730 F. App'x 216, 219 (5th Cir. 2018) (unpublished) (Haynes, J., concurring) (suggesting judicial notice of certain facts may show absence of plain error). Here, we may judicially notice certain facts evident from Huntsberry's state court record of conviction, which, even though not introduced in the district court, is a source whose accuracy cannot reasonably be doubted (especially in light of Huntsberry's stipulation).[7] It is well-settled that courts may judicially notice court records as evidence of judicial actions. *See* 21B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5106.4 (2d ed. 2019); *see also Landry v. Lynaugh*, 844 F.2d 1122, 1124 n.8 (5th Cir. 1988) (judicially noticing state-court trial records); *Garcia v. Kerry*, 557 F. App'x 304,

---

[7] In taking this approach, we do not endorse the use of judicial notice to supply a missing element of an offense in the first instance. We are only deciding, through the highly deferential lens of plain error review, whether the result of the proceedings would have been different had the district court not failed to consider *Rehaif*'s knowledge requirement.

309 (5th Cir. 2014) (per curiam) (unpublished) (judicially noticing record of prior conviction); *United States v. Ferguson*, 681 F.3d 826, 833–35 (6th Cir. 2012) (judicially noticing state conviction records when evaluating substantial rights prong of plain error review).[8]

Here, Huntsberry's record of conviction shows that, pursuant to a plea agreement, he was convicted in April 2003 on one count of "carnal knowledge of a juvenile" in Louisiana's 15th Judicial District Court, *see* LA. REV. STAT. § 14:80, for which crime he received a suspended sentence of 2 years of imprisonment followed by 3 years of supervised probation.[9] Based on these facts, there is little possibility that Huntsberry was ignorant of his status as a convicted felon. Although Huntsberry points out that he spent no time in prison following his conviction, this is only because his two-year prison sentence was suspended. Moreover, Huntsberry received his suspended prison sentence after pleading *nolo contendere*, and Louisiana law requires that "[i]n a felony case, the court shall not accept a plea of guilty or nolo contendere without first addressing the defendant personally in open court and informing him of, and determining that he understands . . . the maximum possible penalty provided by law." LA. CODE CRIM. PROC. art. 556.1. Thus Huntsberry

---

[8] By stipulating to his prior conviction at trial, Huntsberry invoked the protections of *Old Chief v. United States*, 519 U.S. 172, 190–91 (1997), precluding the prosecution from introducing evidence of the nature of Huntsberry's prior crimes or the sentence(s) he received. But, as the dissent in *Rehaif* recognized, "if a defendant's knowledge is now necessary, the logic of *Old Chief* is undermined." 139 S. Ct. 2191, 2209 (Alito, J., dissenting). While the precise meaning of *Old Chief* has become unclear, we agree with the Seventh Circuit that "[b]y putting his knowledge at issue . . . [Huntsberry] would be allowing the government to introduce evidence about the nature of his conviction that would otherwise be too prejudicial." *United States v. Williams*, 946 F.3d 968, 974 (7th Cir. 2020). Thus, in considering whether the result of the proceedings would have been different but for the district court's errors, we assume that—had Huntsberry put knowledge of his felon status at issue—*Old Chief* would not have precluded the Government from presenting the evidence as to the nature of Huntsberry's prior conviction and the sentence he received.

[9] We note that Huntsberry did not object to the PSR's recitation of these same facts.

undoubtedly understood that the offense to which he pleaded *nolo contendere* was punishable by more than one year in prison.[10] And because he received a suspended sentence, Huntsberry does not fall within the hypothetical example given in *Rehaif* itself: "a person who was convicted of a prior crime but sentenced only to probation." 139 S. Ct. at 2198. Furthermore, as a condition of his supervised release, Huntsberry was obligated to participate in a sex offender notification program for the duration of his probation.

Taken together with his stipulation, these facts lead us to conclude that Huntsberry could not have been ignorant of his status as a convicted felon at the time the firearms were found in his possession. More to the point, Huntsberry has put forth no evidence establishing that, had he known about *Rehaif* at the time of his trial, he would have opted to let the jury learn he had been convicted for carnal knowledge of a juvenile, sentenced to two years imprisonment, and participated in a sex offender program, rather than simply stipulating that he knew his status as a convicted felon. Without any such evidence, Huntsberry fails to meet his burden to show that the district court's error affected his substantial rights.[11]

---

[10] The fact that Huntsberry pleaded *nolo contendere* does not prevent his crime from serving as the predicate offense under § 922(g). Section 921(a)(20) of Title 18 instructs that "[w]hat constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." For sex crimes such as felony carnal knowledge of a juvenile, Louisiana law treats a *nolo contendere* plea as a conviction. *See* LA. REV. STAT. § 15:541(7).

[11] Our court and other courts have come to the same conclusion whenever it was obvious the defendant knew he had been previously convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1); *see, e.g.*, *Reed*, 941 F.3d at 1022 (substantial rights prong not satisfied where defendant was previously convicted on 8 felony counts and served 18 years in prison); *Benamor*, 937 F.3d at 1189 (9th Cir. 2019) (third prong of plain error standard not met where defendant had 7 prior felony convictions, including one for possessing firearm as felon, and spent more than 9 years in prison); *Hollingshed*, 940 F.3d at 416 (third prong not satisfied where defendant was previously sentenced to 78 months' imprisonment, served over 5 years, and made jail call indicating

No. 18-31269

4.

Even if we were to conclude that Huntsberry meets his burden on the substantial rights prong, we still would not reverse because Huntsberry fails to show the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (cleaned up). Formulated differently, we have discretion to reverse or vacate Huntsberry's conviction only if there has been a manifest miscarriage of justice. *Delgado*, 672 F.3d at 330–31.

Here, in light of the facts ascertained from Huntsberry's record of conviction, we see no manifest miscarriage of justice. To the contrary, it would be a miscarriage of justice and a blow to the public reputation of judicial proceedings to *reverse* Huntsberry's felon-in-possession conviction based simply on his post-*Rehaif* argument that "the possibility is quite real" he was unaware of his felon status. *See Johnson*, 520 U.S. at 470; *see also Miller*, 2020 WL 1592254, at *4. Our conclusion on this point is bolstered by the fact that Huntsberry attempts to support his *Rehaif* argument by contending that he received only a probated sentence for his prior felony, when in reality his probated sentence was layered on top of his two-year suspended sentence. It is perhaps for these reasons that Huntsberry's counsel nearly abandoned his *Rehaif* challenge at oral argument.

In sum, the Government's failure to adduce sufficient evidence of Huntsberry's knowledge of his felon status, along with the district court's failure to instruct the jury according to *Rehaif*, while plainly erroneous, did not affect Huntsberry's substantial rights. And, even if they did, these errors did not seriously affect the fairness, integrity, or public reputation of the judicial

---

awareness of felon status); *United States v. Williams*, 946 F.3d 968, 973–74 (7th Cir. 2020) (third prong not satisfied where defendant spent 12 years in jail for murder).

proceedings. Therefore, we decline to reverse Huntsberry's felon-in-possession conviction on account of *Rehaif*.

## C.

Finally, we consider Huntsberry's claim that the district court erred by declining to sever the felon-in-possession count from the drug counts. Although Huntsberry may have been disadvantaged by the joinder, since it allowed the Government to introduce Huntsberry's otherwise inadmissible prior felony conviction, we hold he was not prejudiced to the extent necessary for reversal.

A district court may join separate offenses in the same indictment if the offenses are of the same or similar character, based on the same act or transaction, or connected with or parts of a common scheme or plan. *United States v. McCarter*, 316 F.3d 536, 538 (5th Cir. 2002); *see* FED. R. CRIM. P. 8(a). "Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder." *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995) (citation omitted). We review a claim of misjoinder *de novo*, subject to harmless error analysis. *United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012). Misjoinder "requires reversal only if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Lane*, 474 U.S. 438, 449 (1986) (internal quotation marks and citation omitted).

A district court may sever charges properly joined under Rule 8 if the defendant "may be prejudiced" by joinder. *United States v. Ballis*, 28 F.3d 1399, 1408 (5th Cir. 1994); *see* FED. R. CRIM. P. 14(a). We review denial of a motion to sever for abuse of discretion and should not reverse "unless there is clear, specific and compelling prejudice that resulted in an unfair trial." *United States v. Singh*, 261 F.3d 530, 533 (5th Cir. 2001) (cleaned up). To demonstrate compelling prejudice, "[t]he defendant must show something more than the

fact that a separate trial might offer him a better chance of acquittal." *Ballis*, 28 F.3d at 1408 (internal quotation marks and citation omitted).

That said, "[f]elon-in-possession-of-a-firearm charges present special prejudice concerns that are not reflected in the usual presumption in favor of joinder" because, absent severance, the jury will hear evidence of a defendant's prior felonies that would otherwise be inadmissible. *United States v. Turner*, 674 F.3d 420, 430 (5th Cir. 2012); *see also McCarter*, 316 F.3d at 538. In light of these concerns, "a proper inquiry into the propriety of trying the felon count together with the other charges requires examining not only the efficacy of the limiting measures taken by the trial court, but also the strength of the evidence of the defendant's guilt." *McCarter*, 316 F.3d at 538–39. For example, we have permitted joinder "when the weapon was found during the investigation of the other offenses charged, when the weapon might have been available for use during the other offenses, and a limiting instruction was given." *Turner*, 674 F.3d at 430. However, this court has been "less inclined toward joinder when the firearm was less relevant to the other offenses, such as when it was found at the time of arrest, months after the other indicted crimes; when the possibility of prejudice seemed especially problematic, such as when the evidence for the other crimes was 'thin,' though legally sufficient; or when the prosecutor's motives for adding the charge seemed suspect or was merely a technique to introduce evidence of the defendant's bad character." *Id.*

In this case, Huntsberry argues initial joinder was improper because there was no connection between the guns found in his trailer and the charged drug offenses. Relying chiefly on *McCarter*, Huntsberry submits that even if initial joinder was proper, the district court abused its discretion in refusing to sever the gun count because, in light of the weakness of the evidence on the drug charges, no jury instruction could overcome the prejudicial effect of introducing Huntsberry's prior felony conviction.

No. 18-31269

Huntsberry's arguments have some force. The Government presented no evidence connecting the guns to the drug crimes, other than the fact that police happened upon the guns in a closet during their search for drugs. Nevertheless, by bringing the gun charge, the prosecution was able to reveal to the jury that Huntsberry was a convicted felon. That the jury ultimately convicted Huntsberry on the drug charges while acquitting his mother—who received the packages and was found with marijuana in her house—lends some additional credence to Huntsberry's contentions. Nonetheless, we are not persuaded that Huntsberry's arguments meet the standard for reversal.

Regarding Huntsberry's improper joinder claim, it was proper under *Bullock* for the district court to join the counts. In *Bullock*, we affirmed the joinder of a felon-in-possession count to an armed robbery count where the possession count related to a gun found in the trunk of the getaway car, even though that gun had not been used in the robbery. *See* 71 F.3d at 175. We noted our court had "allowed the joinder of firearm charges with other offenses when the gun was found during the investigation of the offense." *Id.*; *see also Mays*, 466 F.3d at 340–41 ("When firearms are found during the investigation of an offense, joinder of the [felon-in-possession] charges is appropriate."). Huntsberry tries to distinguish *Bullock* and *Mays*, arguing the connection between the guns and the drug trafficking here is more attenuated. Be that as it may, that does not change the fact that Huntsberry's situation fits comfortably within the rule from those cases allowing joinder when a gun is found "during the investigation of the offense." *Mays*, 466 F.3d at 340–41; *Bullock*, 71 F.3d at 175.

As to the denial of Huntsberry's motion to sever, which is reviewed for abuse of discretion, Huntsberry rightly cites *McCarter* as his best case. But *McCarter* is distinguishable. There, DEA agents orchestrated a sting operation to catch a suspected drug trafficker named Russell. 316 F.3d at 537. On the

night of the operation, agents learned that Russell's associate, McCarter, would be also involved in the staged drug robbery. *Id.* McCarter showed up with Russell in a Volvo while other associates "robbed" the staged drugs and placed them in a different car. *Id.* McCarter was immediately arrested, but no drugs or weapons were found in his vehicle other than a box of ammunition under the driver's seat. *Id.* Two months after the Government indicted McCarter on drug charges, and mere days after he moved to exclude his prior convictions and the ammunition, the Government added a felon-in-possession count. *Id.* at 540. Ultimately, McCarter was acquitted on the felon-in-possession count and we concluded that the district court abused its discretion in denying McCarter's motion to sever. *Id.* at 542.

The key factor in *McCarter* was that the evidence on the drug charges, while legally sufficient, was "thin." 316 F.3d at 542. The evidence was so weak that, after McCarter was convicted on the drug counts and acquitted on the felon-in-possession count, the district court granted his motion for a new trial. *Id.* at 537. Here, as we have painstakingly detailed, the evidence on the drug charges is not thin. *See* Part I, *supra.* Moore and Ardoin testified directly about Huntsberry's role in the marijuana trafficking conspiracy, and the Government presented material evidence such as shipping labels, wire transfer records, a scale, and what appeared to be a drug ledger. Although the credibility of Moore and Ardoin could be questioned, the jury was entitled to credit their testimony.

Additionally, in *McCarter* the Government's ill-motives were readily apparent. For instance, the indictment timeline "cast[] doubt on the legitimacy of the government's impetus in adding the felon-in-possession count," *McCarter*, 316 F.3d at 540, and the Government was unwilling to try the ammunition count together with another felon-in-possession count (related to a shotgun discovered away from the crime scene) that had already been

severed. *Id.* at 541. Here, by contrast, there is no evidence of Government ill-motive.

In sum, as a result of the joinder of the charges, Huntsberry did not face the sort of clear prejudice required for reversal. We therefore hold that initial joinder was proper and, further, that the district court did not abuse its discretion by denying Huntsberry's motion to sever.

* * *

For the foregoing reasons, Huntsberry's convictions are AFFIRMED.