# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-31213

United States Court of Appeals
Fifth Circuit

**FILED**
June 9, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ANDRE PATRICK STAGGERS, also known as Dre Staggers; LEONARD MORRISON, also known as Leonard London; COREY SESSION,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana

Before KING, JONES, and COSTA, Circuit Judges.

KING, Circuit Judge:

Andre Staggers, Leonard Morrison, and Corey Session were jointly indicted and tried in a drug-conspiracy prosecution. Staggers and Session were found guilty of the charged conspiracy, but Morrison was found not guilty. The jury also found that both Staggers and Session knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin. Because of their prior convictions, Staggers and Session each received a mandatory term of life in prison due to the jury's verdict on the conspiracy charge and its drug-quantity finding. Several weeks after they were sentenced, Congress passed the First Step Act, which reduced the mandatory minimum sentence

No. 18-31213

applicable to defendants like Staggers and Session. On appeal, Staggers and Session argue that they should be resentenced, since their convictions were not final when the First Step Act became effective. We conclude, however, that the relevant provisions of the First Step Act do not apply to defendants who were sentenced before the Act's effective date.

In addition to finding Staggers and Session guilty of conspiracy, the jury found all three defendants guilty of violating 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing firearms. When the district court tried this case, our precedent—along with precedent from every other circuit court to have considered the issue—held that knowledge of one's felon status was not an element of a § 922(g)(1) offense. The Supreme Court overruled this precedent while this appeal was pending, so Staggers and Morrison now contend that they are entitled to a new trial. We hold that they are not so entitled.

Finally, we address several issues, each of which affects only one defendant. Morrison argues that the warrantless search of his home was not consensual and that the district court should therefore have granted his motion to suppress the fruits of that search. Session, meanwhile, contends that one of the district court's evidentiary rulings was an abuse of discretion and that there was legally insufficient evidence for the jury to conclude that he knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin.

We conclude that Morrison's argument regarding his motion to suppress is the only single-defendant issue having any merit. At the suppression hearing, the district court heard testimony setting out two very different versions of events regarding the search of Morrison's home. Both versions agreed, however, that no one objected when law-enforcement officers entered Morrison's home. The district court erroneously believed that this was enough

No. 18-31213

to render the entry—and the subsequent search—consensual, so it did not decide which version of events to credit. Because a credibility determination was necessary, we vacate the district court's decision to deny Morrison's motion to suppress and remand for further proceedings. In all other respects, we affirm the judgment of the district court.

## I.

## A.

The Drug Enforcement Administration, in partnership with state and local law enforcement, began investigating drug trafficking in LaPlace and St. Rose, Louisiana after receiving a tip from a confidential informant in January 2015. The DEA subsequently obtained judicial authorization for wiretaps of telephones belonging to Andre Staggers, Corey Session, and two other subjects of the investigation. Based in part on these wiretaps, the DEA obtained search warrants for Staggers's residence, Session's residence, and a suspected stash house.

The DEA executed those search warrants on February 25, 2016. At Staggers's residence, the DEA found: (i) approximately 460 grams of heroin; (ii) a loaded assault rifle; (iii) drug paraphernalia; (iv) a money counter; (v) over $460,000 in cash; and (vi) mail addressed to Staggers. Session's residence contained: (i) a loaded assault rifle; (ii) a loaded pistol; (iii) bottles of mannitol, a cutting agent used to dilute cocaine and heroin; (iv) drug paraphernalia; (v) over $1,000 in cash; and (vi) mail addressed to Session. Inside the third house, the suspected stash house, the DEA seized: (i) over 500 grams of heroin; (ii) 11 grams of powder cocaine; (iii) 37 grams of crack cocaine; (iv) an assault rifle; (v) a pistol; (vi) ammunition of various calibers; (vii) bottles of mannitol; (viii) drug paraphernalia; (ix) a money counter; (x) $14,000 in cash; (xi) mail addressed to Session; and (xii) identification cards belonging to Session.

No. 18-31213

On the same day, the DEA conducted a warrantless search of Morrison's residence. The United States and Morrison disagree about whether this search was consensual—and, hence, whether it yielded admissible evidence—but they do not dispute its results. As relevant to this appeal, the law-enforcement officers searching Morrison's house asked him whether there was a weapon in the house. Morrison told them that he found a firearm in his attic and moved it to his bedroom closet for safekeeping. The officers found that firearm, which was partially loaded, in the location that Morrison had indicated.

Staggers, Session, and Morrison were jointly charged with federal drug-trafficking and firearms offenses. Among other things, all three defendants were charged with conspiring to distribute and to possess with intent to distribute powder cocaine and heroin in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. According to the indictment, Staggers and Session knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin and five kilograms or more of cocaine, whereas the amount of drugs allegedly attributable to Morrison was considerably lower, no heroin and only five-hundred grams or more of cocaine. In addition to the conspiracy charge, all three defendants were charged with violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms.

**B.**

Before trial, Morrison moved the district court to suppress the evidence obtained during the warrantless search of his residence, arguing that the search—particularly the initial entry of law-enforcement agents into his house—was not consensual. The district court held an evidentiary hearing at which the United States called the two law-enforcement officers who made that entry, Rohn Bordelon and David Biondolillo, to the stand. Bordelon and Biondolillo testified that they knocked on Morrison's door at approximately 6:00 a.m. and identified themselves to Shlonda Jupiter—Morrison's live-in

4

girlfriend and the mother of his children—who answered the door. They asked her whether Morrison was present and, while speaking with Jupiter, the officers saw Morrison in the hallway behind her, which led Bordelon to call out to him. Bordelon testified that: (i) Jupiter "stepped back and opened the door some more"; (ii) he subsequently asked Morrison whether he could come inside and talk; and (iii) Morrison answered in the affirmative. Similarly, Biondolillo testified that he remembered Jupiter "kind of moving out the way, her opening the door allowing us in."

Once inside, Bordelon told Morrison that he "smelled a strong odor of burnt marijuana and that it smelled like it was still burning." Morrison replied that he had smoked a marijuana cigarette the night before. Bordelon commented that it smelled like the marijuana was still burning, which prompted Morrison to lead Bordelon to the master bedroom to show him a partially burnt marijuana cigarette on the dresser. At about this time, Bordelon read Morrison his *Miranda* rights and Morrison agreed to continue talking to Bordelon. Bordelon then asked Morrison for consent to search the property and to sign a consent-to-search form. Morrison gave his consent and signed the form after Bordelon explained its contents. Both Bordelon and Biondolillo testified that no one threatened to arrest Jupiter or take away Morrison's children if he refused to sign.

Morrison, on the other hand, called Jupiter as a witness, and she told a significantly different story regarding the initial entry into her residence. Jupiter testified that she stood between the door and the doorframe while talking to Bordelon and Biondolillo, who "pushed the door open and came bumping in." According to Jupiter, Bordelon and Biondolillo did not speak to Morrison while standing outside the house, much less obtain permission from Morrison to enter. Instead, the officers "pushed past" Jupiter and stood in the living room until Jupiter brought Morrison out of the bedroom to speak with

them. Additionally, Jupiter testified that, after being released from jail following his arrest, Morrison "said they told him they was going to take the kids and bring [her] to jail" if he did not sign the consent-to-search form.

The district court denied Morrison's motion to suppress. It found that Bordelon and Biondolillo did not coerce Morrison to sign the consent-to-search form by threatening to arrest Jupiter or take away Morrison's children, although the district court allowed that "Morrison may have told Jupiter that the officers threatened him." The district court also found that "under the totality of the circumstances, Jupiter gave implied consent for the officers to enter the residence." The district court did not, however, decide whether Jupiter's testimony or the testimony of Bordelon and Biondolillo was more credible. Such a credibility determination was unnecessary, in the district court's view, because the district court believed that "testimony of all parties indicates that there was no forced entry nor antagonistic response" and "Jupiter did not testify that the officers physically moved her out of the way."

## C.

The case went to trial in August 2018. The United States presented evidence regarding the firearm found at Morrison's home as well as the evidence found while executing the search warrants for Staggers's residence, Session's residence, and the suspected stash house. The jury heard various telephone recordings obtained via the wiretaps secured by the DEA. The jury also heard testimony from Powell Morris, the DEA agent leading the investigation, regarding the meaning of certain terms used in those recordings; for example, Agent Morris testified that "alligator" and "gator meat" referred to heroin. Finally, a stipulation was read to the jury stating that, "[b]efore February 25th, 2016, [all three defendants] had been convicted in a court for a crime punishable for a term in excess of one year, that is, a felony offense."

No. 18-31213

At the end of a five-day trial, the jury returned a verdict. The jury found all three defendants guilty of possessing a firearm in violation of § 922(g)(1). The jury found Staggers and Session—but not Morrison—guilty of conspiring to distribute and to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. In response to a special interrogatory, the jury indicated that Staggers and Session knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin.

Morrison was sentenced on November 28, 2018. According to the Presentence Investigation Report prepared by the United States Probation Office, Morrison was subject to a fifteen-year mandatory minimum sentence under the Armed Career Criminal Act, because he had three serious drug offense convictions. Morrison argued that he was not the defendant charged and convicted in one of the predicate offenses listed in the PSR, but the district court rejected that argument after reviewing the court records attached to the PSR. The district court concluded that Morrison's Guidelines sentencing range was 235 to 293 months imprisonment, but the district court granted a downward variance to the mandatory minimum sentence.

Staggers and Session were sentenced on November 14, 2018 and December 6, 2018, respectively. At that time, defendants who violated § 841(b)(1)(A) "after two or more prior convictions for a felony drug offense have become final" were subject "to a mandatory term of life imprisonment without release." 21 U.S.C. § 841(b)(1)(A) (2012). Neither Staggers nor Session contested that he had two qualifying convictions and the district court accordingly sentenced both of them to life imprisonment.

Weeks later, Congress passed the First Step Act. If Staggers and Session had been sentenced under the First Step Act's provisions, they would have

7

No. 18-31213

faced "a term of imprisonment of not less than 25 years." 21 U.S.C. § 841(b)(1)(A). All three defendants filed timely notices of appeal.

## II.

We first address the argument, advanced by Staggers and Session, that the First Step Act's reductions to mandatory minimum sentences for § 841 offenses apply in all cases that were pending when the Act was enacted. "At common law, the repeal of a criminal statute abated all prosecutions which had not reached final disposition in the highest court authorized to review them. . . . And the rule applied even when the penalty was reduced." *Bradley v. United States*, 410 U.S. 605, 607-08 (1973). While we would apply this background principle to a statute that was silent regarding its applicability to pending cases, the First Step Act is not such a statute. Congress specified that the provision relevant here "shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment." Pub. L. No. 115-391 § 401(c), 132 Stat. 5194, 5221 (2018).

A sentence is imposed when it is pronounced by the district court and not, as Session and Staggers would have it, when the appellate process comes to an end. *United States v. Gomez*, No. 18-11578, 2020 WL 2536615, at *2 (5th Cir. May 19, 2020); *see United States v. Gonzalez*, 163 F.3d 255, 264 (5th Cir 1998) (construing Rule 35 of the Federal Rules of Criminal Procedure); *see also* 18 U.S.C. § 3553(a) (listing factors to be considered by the district court "in determining the particular sentence to be imposed"). We thus agree with the Sixth Circuit that, for the purposes of § 401(c) of the First Step Act, "a sentence is 'imposed' when the trial court announces it, not when the defendant has exhausted his appeals from the trial court's judgment." *United States v. Richardson*, 948 F.3d 733, 748 (6th Cir. 2020); *see also Gomez*, 2020 WL 2536615, at *3 ("The date that matters in the § 403 inquiry is when the district

8

No. 18-31213

court imposed the defendant's sentence—not when the defendant exhausted his appeals."); *United States v. Aviles*, 938 F.3d 503, 510 (3d Cir. 2019) ("'Imposing' sentences is the business of district courts, while courts of appeals are tasked with reviewing them by either affirming or vacating them."). Accordingly, we conclude that Staggers and Session do not benefit from § 401 of the First Step Act and that the district court's determination that they were subject to mandatory minimum sentences of life imprisonment was—and remains—correct.

## III.

Staggers and Morrison ask us to invalidate their § 922(g)(1) convictions because of the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), but we conclude that such action is not warranted. *See United States v. Hicks*, No. 18-11352, 2020 WL 2301461, at *2 (5th Cir. May 8, 2020) ("[W]e have not considered *Rehaif* errors to warrant automatic reversal."); *see also United States v. Lavalais*, No. 19-30161, 2020 WL 2609858, at *4 (5th Cir. May 22, 2020) (concluding that a *Rehaif* error associated with a guilty plea was not a structural error). Section 922(g)(1) states that it is unlawful for a convicted felon to possess a firearm; anyone who "knowingly violates" this prohibition is subject to criminal punishment. 18 U.S.C. § 924(a)(2). Before *Rehaif*, we—along with every other circuit court to have considered the issue—required the United States to prove that a defendant knowingly possessed a firearm but not that the defendant knew he or she was a felon. *United States v. Dancy*, 861 F.2d 77, 81 (5th Cir. 1988); *see also Rehaif*, 139 S. Ct. at 2201 (Alito, J., dissenting) ("The Court casually overturns the long-established interpretation of an important criminal statute, 18 U.S.C. § 922(g), an interpretation that has been adopted by every single Court of Appeals to address the question.").

No. 18-31213

We now know, however, that knowledge of felon status is an element of a § 922(g)(1) offense. *Rehaif*, 139 S. Ct. at 2194. It follows, according to Staggers and Morrison, that the district court erred by failing to instruct the jury on the knowledge-of-felon-status element. Additionally, they contend that there was insufficient evidence introduced at trial regarding their knowledge such that the district court erred by denying their Rule 29 motions. *See* Fed. R. Crim. P. 29(a) (permitting the defendant to move for "a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction").

Because they did not object to the district court's omission of the knowledge-of-felon-status element, we review the challenge to the jury instructions for plain error. *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018). We review the sufficiency of the evidence de novo, however, because Staggers and Morrison made general objections to the sufficiency of the evidence. *See United States v. Daniels*, 930 F.3d 393, 402 (5th Cir. 2019) ("When a defendant makes a general sufficiency-of-the-evidence challenge, we review the sufficiency of the evidence supporting a conviction de novo.").

## A.

The plain-error standard requires "a showing that there was '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *United States v. McGilberry*, 480 F.3d 326, 328-29 (5th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). If this showing is made, we have discretion to correct the error, but we will exercise that discretion only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Puckett v. United States*, 556 U.S. 129, 135 (2009). The United States concedes the district court erred and that the error was—in the relevant sense—clear and obvious, so we do not need to address those elements. *See United States v. Escalante-Reyes*, 689 F.3d 415, 423 (5th Cir. 2012) (en banc) ("[W]here the law is unsettled at the time of trial but settled by the time of

appeal, the 'plainness' of the error should be judged by the law at the time of appeal.").

"Ordinarily, to show that a clear and obvious error affected his substantial rights, a defendant 'must "show a reasonable probability that, but for the error," the outcome of the proceeding would have been different.'" *United States v. Wikkerink*, 841 F.3d 327, 337 (5th Cir. 2016) (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)). Our inquiry is thus whether there is a reasonable probability that a properly instructed jury viewing the evidence actually admitted at trial would have returned a different verdict. *See Fairley*, 880 F.3d at 208 ("Jury instruction error 'does not amount to plain error unless it could have meant the difference between acquittal and conviction.'" (quoting *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001))); *see also United States v. Miller*, 954 F.3d 551, 558 (2d Cir. 2020) (considering whether a *Rehaif* error affected the defendant's substantial rights and stating that, "[i]n answering this question, we appropriately limit ourselves to the evidence actually presented to the jury").[1]

Omitting the knowledge-of-felon-status element did not affect Staggers's substantial rights. Even though Staggers stipulated to § 922(g)(1)'s felon-status element, the United States used Rule 404(b) of the Federal Rules of Evidence to introduce evidence regarding Staggers's prior cocaine-trafficking

---

[1] Our recent decision in *United States v. Huntsberry*, 956 F.3d 270 (5th Cir. 2020), is not to the contrary, because *Huntsberry* expressly avoided addressing whether the substantial-rights inquiry is limited to the evidence before the jury. *Id.* at 284 ("[W]e face the question of what sources of evidence we, as an appellate court, may properly consider in determining whether the district court's errors affected Huntsberry's substantial rights. . . . We need not resolve the issue here . . . ."). *Huntsberry* held only that it was permissible to supplement the appropriate body of evidence—whatever that may be—via judicial notice. *Id.* And it did so with respect to plain-error review only, even though the effect of an error on a defendant's substantial rights is relevant even when the error is properly preserved. *Id.* at 285 n.7 ("[W]e do not endorse the use of judicial notice to supply a missing element of an offense in the first instance."); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

convictions. *See* Fed. R. Evid. 404(b) (stating that evidence of "a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but allowing such evidence to be admitted "for another purpose"). Specifically, the jury was told that Staggers was convicted in state court for possession of cocaine with intent to distribute and that he was convicted in federal court for conspiracy to distribute cocaine. Additionally, the jury saw minutes from the state-court proceeding, which indicated that Staggers received a fifteen-year sentence.[2] Because this evidence was before the jury, there is not a reasonable probability that the jury would have returned a different verdict as to Staggers if it had been properly instructed.

The district court's omission of the knowledge-of-felon-status element may, however, have affected Morrison's substantial rights. The only relevant evidence before the jury vis-à-vis Morrison was his stipulation that, "[b]efore February 25, 2016," i.e., the date that the DEA found a gun in Morrison's home, he had "been convicted in a court of a crime punishable for a term in excess of one year, that is, a felony offense." Like the Second Circuit, we believe that "the substantial-rights analysis in [such a] case is a difficult one, given the paucity of factual development at trial pertaining to a question that was not discerned before *Rehaif* was decided." *Miller*, 954 F.3d at 559. Accordingly, "we choose to resolve this case on the fourth prong of plain-error review." *Id.*

Morrison does not argue that he actually lacked knowledge of his status as a felon. The record before us—but not the jury—shows that Morrison must have known that he was a convicted felon. *See id.* at 560 ("[I]n the limited

---

[2] Staggers argues that the jury would not have been permitted to use this evidence to conclude he knew that he was a felon since it was admitted under Rule 404(b), but that rule expressly states that evidence of prior crimes "may be admissible for . . . proving . . . knowledge." Fed. R. Evid. 404(b)(2).

context of our fourth-prong analysis, we will consider reliable evidence in the record on appeal that was not a part of the trial record . . . ."). Morrison has several felony drug convictions and has served several multi-year prison terms. Further, we are confident that if *Rehaif* had been decided when his case went to trial, Morrison would have stipulated to both the felon-status element and the knowledge-of-felon-status element to keep the jury ignorant of the inculpatory details otherwise required to prove knowledge of felon status. We therefore conclude that the district court's error does not significantly affect the fairness, integrity, or public reputation of judicial proceedings, so we will not exercise our discretion to correct it.

## B.

Staggers's and Morrison's § 922(g)(1) convictions are supported by legally sufficient evidence even after *Rehaif*. Absent sufficient evidence, due process requires the entry of a judgment of acquittal even if a jury returns a guilty verdict. *Burks v. United States*, 437 U.S. 1, 18 (1978) ("[O]nce the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal."). Evidence is sufficient if a reasonable jury "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Sufficiency is measured against the *actual* elements of the offense, not the elements stated in the jury instructions. *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) ("A reviewing court's limited determination on sufficiency review thus does not rest on how the jury was instructed."). Likewise, a reviewing court assesses the sufficiency of the evidence that was actually presented to the jury, not the evidence that might have been—but was not—admitted at trial. *See id.* ("All that a defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all.").

No. 18-31213

As already noted, the jury received evidence regarding Staggers's prior convictions, and this evidence would have allowed a reasonable jury to infer that Staggers knew he was a convicted felon. The jury did not receive similar evidence regarding Morrison's criminal history, so whether Morrison's conviction is supported by legally sufficient evidence is a closer call. Indeed, Morrison's stipulation—which covered the fact of felon status but not knowledge—was the only evidence relevant to Morrison's knowledge that was before the jury. We conclude, however, that absent any evidence suggesting ignorance, a jury applying the beyond-a-reasonable-doubt standard could infer that a defendant knew that he or she was a convicted felon from the mere existence of a felony conviction. *See United States v. Conley*, No. 19-5168, 2020 WL 571324, at *3 (6th Cir. 2020) (unpublished) ("[T]he jury was entitled to infer knowledge of prohibited status . . . from Conley's stipulation that he had a prior felony conviction."). *But see United States v. Mansfield*, No. 18-CR-466, 2019 WL 3858511, at *1-2 (D. Colo. Aug. 16, 2019) (concluding that a stipulation as to felon status was "insufficient to prove that [the defendant] knew he was a convicted felon at the time he possessed the firearm"). We therefore conclude that the § 922(g)(1) convictions of both Staggers and Morrison were supported by legally sufficient evidence.

## IV.

We now turn to an issue that is raised by Morrison alone, whether the district court erred by denying his motion to suppress. "When a district court denies a motion to suppress evidence, we review the factual findings for clear error and legal conclusions about the constitutionality of the conduct of law enforcement officers *de novo*." *United States v. Beene*, 818 F.3d 157, 161 (5th Cir. 2016). "Under the Fourth Amendment, a warrantless search of a person's home is presumptively unreasonable, and it is the government's burden to bring the search within an exception to the warrant requirement." *United*

No. 18-31213

*States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011). The government does not need a warrant if it receives: (i) consent; (ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search does not exceed the scope of the consent received. *United States v. Freeman*, 482 F.3d 829, 831-32 (5th Cir. 2007). In challenging the denial of his motion to suppress, Morrison argues that the district court clearly erred when it evaluated the first, second, and third elements of a consent search. We remand for further proceedings regarding whether consent was given, but we conclude that the district court did not clearly err regarding voluntariness or authority.[3]

**A.**

Consent to a search does not need to be explicit, but it can be inferred from silence or failure to object to a search only if that silence follows a request for consent. *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996); *see also United States v. Martinez*, 410 F. App'x 759, 763 (5th Cir. 2011) ("Consent to a search can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent."). Consent may also be inferred from actions that reasonably communicate consent. *See, e.g.*, *United States v. Lewis*, 476 F.3d 369, 381 (5th Cir. 2007) ("The officers reasonably interpreted Caldwell's gesture as an invitation to enter the room.").

The district court concluded that Morrison's girlfriend, Shlonda Jupiter, gave implied consent for two law-enforcement officers, Rohn Bordelon and David Biondolillo, to enter her residence. The district court acknowledged that "[t]he officers testified that Jupiter initially opened the door about half way and then opened it wider and stepped aside for them to enter" while Jupiter

---

[3] Because we are remanding for further proceedings, we do not now need to address Morrison's claim that he was not subject to an enhanced mandatory minimum sentence under the Armed Career Criminal Act, because this claim "is contingent on a valid conviction." *United States v. Cessa*, 861 F.3d 121, 143 (5th Cir. 2017).

"testified that she opened the door a little and stood between the door and the frame, but that she did not open it wider and step aside to allow the officers in." The district court did not decide to credit one version of events over the other; instead, it reasoned that Jupiter gave implied consent because "testimony of all parties indicates that there was no forced entry nor antagonistic response" and "Jupiter did not testify that the officers physically moved her out of the way."[4]

This reasoning is faulty. The officers did not testify—nor did the district court find—that they asked Jupiter for permission to enter, so her failure to object does not constitute implied consent.[5] *See Jaras*, 86 F.3d at 390. Thus, Jupiter implicitly consented to the officers' entry, if at all, by opening the door wider and stepping aside, a gesture that could be understood as communicating consent depending on the surrounding circumstances. *See United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976). But the district court, while aware of the conflicting testimony on this point, elected not to resolve it.

The United States asks us to infer that the district court made the requisite finding, i.e., that Jupiter opened the door wider and stepped back to allow the officers to enter, but we decline to do so. A district court "must state its essential findings on the record" if "factual issues are involved in deciding a motion." Fed. R. Crim. P. 12(d). Where a district court fails to make a finding, we will ordinarily affirm if "any reasonable view of the evidence supports" the

---

[4] Additionally, the district court's characterization of Jupiter's testimony is not entirely accurate. Jupiter testified that the law-enforcement officers who knocked on her door "basically pushed past" her and "pushed the door open and came bumping in" without ever asking for permission to enter. While being cross-examined, she confirmed that the officers "barged in the door."

[5] One of the officers testified that, while at the door, he saw Morrison, asked *him*—not Jupiter—for permission to enter the house, and received an affirmative reply.

16

No. 18-31213

district court's decision. *United States v. Guzman*, 739 F.3d 241, 247 (5th Cir. 2014) (quoting *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir. 1991)). This practice assumes, however, that the district court "asked the right legal questions in making its ruling" and "actually weighed the evidence bearing on the facts needed to answer them." *Id.* (quoting *United States v. Williams*, 951 F.2d 1287, 1290-91 (D.C. Cir. 1991)). If there is "a basis to question" one of those assumptions, we may remand instead of affirming. *Id.* at 247-48.

There is reason to question both assumptions in this case. As to the first assumption, the district court erroneously believed, contrary to our precedent, that Jupiter's failure to object to the officers' entry constituted implied consent absent a request for consent from the officers. Regarding the second, the district court avoided weighing the conflicting testimony presented and instead based its decision on matters about which Jupiter and the law-enforcement officers agreed. Because the district court did not make a necessary finding, and because we are not certain how the district court would have ruled if it had addressed the issue,[6] we remand for further proceedings.

## B.

Morrison argues that, even if Jupiter gave implied consent, it was not given voluntarily, but the district court did not clearly err by concluding otherwise. Voluntariness depends on the totality of the circumstances, and we have identified six relevant factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's

---

[6] There is reason to think that the district court viewed the law-enforcement testimony with some degree of skepticism. It was not willing to rely, for example, on testimony from one of the law-enforcement officers that Morrison gave express verbal permission for the officers to enter.

17

education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Glenn*, 931 F.3d 424, 430 (5th Cir.), *cert. denied*, 140 S. Ct. 563 (2019). According to Morrison, the district court erred in applying the coercive-procedures factor, impermissibly shifted the burden of proof to Morrison, and incorrectly analyzed the totality of the circumstances.

We disagree. First, the district court did not clearly err in analyzing the coercion factor. The court concluded that the knock-and-talk conducted by Borden and Biondolillo was noncoercive, because it was peaceful, the officers "did not shout at or threaten Jupiter," and the officers had their weapons holstered. This supports a finding of voluntariness. *See United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008) (no coercion when police did not have their weapons drawn and did not "threaten[] or yell[] at" the defendant); *United States v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997) (no coercion when defendant was not initially handcuffed, and there were no "threats or violence" or "overt display[s] of authority"). That the officers arrived in the early morning does not necessarily render the knock-and-talk coercive or unreasonable. *Cf. United States v. Lundin*, 817 F.3d 1151, 1159-60 (9th Cir. 2016) (finding a 4:00 a.m. knock-and-talk unconstitutional but noting that not every early-morning knock-and-talk is improper).

Second, the district court did not improperly shift the burden of proof to Morrison. Morrison claims that the United States did not present evidence of Jupiter's awareness of her right to refuse consent, her intelligence, or her belief that incriminating evidence would be found. But the district court did not clearly err in concluding that the Government met its burden on these issues; we have allowed such conclusions to stand when defendants have "presented no evidence that [the consenting party] was unaware of h[er] right to deny consent, nor any evidence that [s]he was mentally deficient or unable to

18

exercise h[er] free will in consenting." *Freeman*, 482 F.3d at 833.  Besides, Jupiter's testimony indicates she knew that she could refuse consent, because she claimed that she "was about to shut the door" on the officers when they barged in. And because the record "leads us to conclude that [Jupiter] had at least average intelligence and education," *United States v. Zavala*, 459 F. App'x 429, 434 (5th Cir. 2012), the district court's failure to make a specific finding on that factor does not merit reversal.

Last, the district court's evaluation of the totality of the circumstances was not clearly erroneous, because several of the relevant factors indicate that Jupiter's consent, if given, was voluntary. Jupiter was not in custody or arrested, and the officers did not use coercive procedures. And Jupiter's testimony that she retrieved Morrison while Borden and Biondolillo waited in the living room evidences cooperation with law enforcement. Paired with the absence of any compelling evidence of involuntariness, this leads us to conclude that the district court did not clearly err when it found, based on the totality of the circumstances, that Jupiter acted voluntarily.

## C.

Morrison's final argument regarding his motion to suppress is that the district court clearly erred by concluding that Jupiter had authority to consent to the officers' entry. To be valid, consent must be given by the defendant or by a third party with actual or apparent authority. *Jaras*, 86 F.3d at 389. Actual authority exists when the third party and the defendant "mutually used the property searched and had joint access to and control of it for most purposes." *United States v. Iraheta*, 764 F.3d 455, 463 (5th Cir. 2014) (quoting *United States v. Rizk*, 842 F.2d 111, 112 (5th Cir. 1988)). Apparent authority exists when "the searching officers 'reasonably (though erroneously) believed that the person who has consented to their' search had the authority to so consent." *Id.* (brackets omitted) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)).

No. 18-31213

Because Jupiter lived with Morrison, the district court did not clearly err by concluding that she had actual authority. *See United States v. Cooke*, 674 F.3d 491, 496 (5th Cir. 2012) ("co-tenants generally have the ability to consent to search").

## V.

Session contends that the district court made two errors concerning the evidence introduced at trial. First, he argues that the district court should not have allowed the DEA case agent, Powell Morris, to provide lay opinion testimony regarding the meaning of certain terms used in wiretapped phone calls that were played for the jury. Second, Session argues that, absent Agent Morris's testimony, the trial evidence was not legally sufficient for the jury to find that he knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin. We need not decide whether the district court erred by admitting some of Agent Morris's testimony; any such error was harmless, because there was overwhelming evidence of Session's guilt apart from the improper testimony. For similar reasons, we conclude that the jury's verdict was supported by legally sufficient evidence.

## A.

After a careful review of the record, we hold that the vast majority of Agent Morris's testimony concerning the meaning of drug codewords was admissible as lay opinion testimony, or at least it was not an abuse of discretion for the district court so to conclude. In many drug-conspiracy prosecutions, the case agent provides opinion testimony regarding the meaning of certain terms used by drug traffickers. We have held that, if qualified as expert witnesses, agents may provide opinion testimony regarding "the 'coded' meaning of specific words and terms commonly used in the drug trade." *United States v. Haines*, 803 F.3d 713, 728 (5th Cir. 2015). Agents may also draw upon their familiarity with a particular case—not "expertise with the drug trade"

generally—to provide lay opinion testimony regarding "the meaning of specific words and terms used by the particular defendants" in the case. *Id.* at 729; *see also United States v. Akins*, 746 F.3d 590, 600 (5th Cir. 2014) ("This Court has recognized that the meaning of drug code words can be within the proper ambit of the testimony of a lay witness with extensive involvement in the underlying investigation."). Further, agents testifying as lay witnesses "may testify about the significance of particular conduct or methods of operation unique to the drug business." *United States v. Espino-Rangel*, 500 F.3d 398, 400 (5th Cir. 2007). We review preserved evidentiary objections "for abuse of discretion, subject to harmless error analysis." *Akins*, 746 F.3d at 598.

The United States laid an adequate foundation regarding Agent Morris's extensive involvement with the investigation. He listened to between 2000 and 3000 telephone calls that were recorded as part of the investigations, some of them many times. He arranged controlled drug purchases, tracked vehicles, and conducted surveillance. Additionally, Agent Morris interviewed defendants and witnesses who knew the defendants. We thus reject Session's argument that there was an insufficient foundation for Agent Morris's lay opinion testimony.[7]

Much of the codeword testimony given by Agent Morris concerned the words used by members of the conspiracy that he investigated, not drug dealers generally, so it was a proper subject for lay opinion testimony. As an example, Agent Morris opined that the terms "gator meat" and "alligator" were used—in calls between Session and Staggers—to refer to heroin. Similarly, the jury heard a recorded call in which Session and Luis Cotto, a defendant who

---

[7] Session argues that this sort of general foundation is insufficient. While the jury may find lay opinion testimony more persuasive if an agent provides specifics for each opinion, we do not believe that the district court abused its discretion when it did not insist on that level of detail.

was indicted with Session but was not tried alongside him, explicitly discussed the price of heroin. On the call, Session told Cotto that the price was "55 and 60 down here" to which Cotto replied that "they pay me 70 in Orlando." Agent Morris testified that he had arrested and interviewed Cotto as part of the investigation, and he opined that Session and Cotto were referring to kilogram amounts of heroin. He also opined that 55, 60, and 70 were shorthand for $55,000, $60,000, and $70,000, respectively. Given the foundation laid by the United States, it was not an abuse of discretion for the district court to conclude that this type of testimony was a proper subject for lay opinion or that Agent Morris was largely drawing on his experience with this investigation, not general drug-trafficking expertise.

Even if portions of Agent Morris's testimony exceeded the permissible scope for lay testimony—the record is sometimes unclear regarding the extent to which Agent Morris was drawing on drug-trafficking expertise—the overwhelming evidence against Session leads us to conclude that any error was harmless. In addition to the gator-meat calls between Session and Staggers, the jury was aware that over 400 grams of heroin had been found at Staggers's residence. The jury was also aware that mail addressed to Session and identification cards in his name were found at a stash house that contained over 500 grams of heroin and drug paraphernalia. On top of that, the jury heard Session explicitly—not in code—discussing the price of heroin in his phone call with Cotto. Finally, Staggers's phone contained a contact denominated "Co." with Session's phone number, and a drug ledger was found at Staggers's residence with entries associated with "Co." Taken together, this evidence convinces us that any errors made by the district court concerning Agent Morris's testimony were harmless.

No. 18-31213

## B.

Session challenges the sufficiency of the evidence underlying the jury's finding that he knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin; absent that finding, Session would not have been subject to a mandatory minimum sentence of life imprisonment. *See* 18 U.S.C. § 841(b)(2)(B) (2012). In a drug-conspiracy prosecution, the statutory minimum sentence applicable to a defendant depends on "the quantity of drugs with which he was directly involved or that was reasonably foreseeable to him." *Haines*, 803 F.3d at 740. This quantity must be found by a jury beyond a reasonable doubt, *see id.* at 741, and the jury's finding must be supported by legally sufficient evidence, *United States v. Daniels*, 723 F.3d 562, 571 (5th Cir. 2013).

Thus, the operative inquiry is whether a reasonable jury could have found, beyond a reasonable doubt, that Session knew or reasonably should have known that the conspiracy involved one kilogram or more of heroin, a question we review de novo. *See United States v. Walker*, 750 F. App'x 324, 325-26 (5th Cir. 2018). The United States does not need to seize a particular amount of drugs to satisfy its burden of proof vis-à-vis drug quantity. *Id.* at 326. As in other contexts, the jury is allowed to make reasonable inferences based on the evidence introduced at trial and thereby extrapolate. *See, e.g.*, *United States v. Wallace*, 759 F.3d 486, 492 (5th Cir. 2014).

A reasonable jury could conclude that Session knew or should have known that the conspiracy involved one kilogram or more of heroin. As already noted, the DEA seized 520 grams of heroin from a house containing drug paraphernalia, over $14,000 in cash, mail addressed to Session, and identification cards in his name. A jury could reasonably infer that Session knew or should have known about the heroin found in this house. Given the gator-meat telephone calls between Session and Staggers, a reasonable jury

23

No. 18-31213

could also infer that Session knew or should have known about the 461 grams of heroin that the DEA found at Staggers's residence. Even ignoring all the other evidence introduced at trial, these 981 grams coupled with Session's telephone conversation with Cotto explicitly discussing heroin are more than enough evidence for us to conclude that the jury's finding was adequately supported by the evidence.

## VI.

As to Session and Staggers, we AFFIRM the judgment of the district court in all respects. As to Morrison, we VACATE the conviction and sentence and REMAND to the district court to obtain additional findings. If the district court again denies Morrison's motion to suppress, it shall reinstate the conviction and sentence. *See United States v. Guzman*, 739 F.3d 241, 249 (5th Cir. 2014). If either Morrison or the United States seeks appellate review following remand, the appeal will be assigned to this panel.