# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-30394

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

KADEEM BURDEN; TIMMY SCOTT, also known as Timothy Scott,

Defendants–Appellants.

Appeals from the United States District Court
for the Middle District of Louisiana

Before SMITH, HIGGINSON, and ENGELHARDT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Kadeem Burden and Timmy Scott appeal their convictions and sentences for unlawfully possessing firearms as felons. We affirm.

I.

Police officer Jesse Barcelona was driving his patrol car when he approached an intersection. Facing in the perpendicular direction were an SUV and a Mercedes. As Barcelona passed through the intersection, two or three

## No. 19-30394

black males in white t-shirts and blue jean shorts exited the SUV, approached the Mercedes, and began repeatedly discharging firearms into it.  When Barcelona turned his car around to return to the scene, the SUV sped away, leaving the shooters running after it with Barcelona in pursuit (the occupants of the Mercedes, providentially it would seem, were uninjured).

The shooters turned to look at Barcelona's approaching car.  Barcelona "could tell that one [of them] was still armed with what appeared to be an AK-47 rifle."  Further, "they appeared to have something [black] covering their face[s]."  They then ran into the local residential block, around which Barcelona (and other officers) secured a perimeter while awaiting the arrival of a canine unit.

Shortly thereafter, an officer at the perimeter spotted two black males, "fully clothed," "come out . . . from behind a residence and then run back in." "Under a minute" later, two black men "came back out . . , not clothed . . . [and were] [s]weating pretty profusely."  With hands raised, the two men shouted "[w]e just got robbed, we just got robbed."  The officers "[took] them into custody[ and] place[d] them in the back of" a police car, awaiting further instruction.

Inside the perimeter and assisted by a dog tracker, officers (including Barcelona) recovered various items.  By one side of a house they found "a black plastic Halloween-style mask on the ground," and underneath the other side they found another such mask and two firearms.[1]  Before completing their search, the unit discovered two cellular phones on the ground and "a pair of blue jean shorts and a pair of white Nike shoes" nearby.

---

[1] The firearms were later identified as a Smith & Wesson 9mm pistol and a Century Arms 7.62x39mm rifle pistol.

No. 19-30394

Upon returning to the perimeter, Barcelona went to the police car, where he "observed Mr. Kadeem Burden [ ] wearing only black or dark-colored under-wear and some socks, and Mr. Scott was only wearing . . . [b]lue jean-style shorts." Based on their general physical appearance, Barcelona "firmly believe[d] that those were the two individuals [he] observed shooting the fire-arms," though he had not seen the shooters' faces uncovered.

DNA and forensic examination linked Burden to one of the weapons and Scott to both phones and one of the masks. Further examination established that the nineteen bullets came from one or both of the firearms discovered at the scene.

## II.

Burden and Scott were charged in an indictment alleging solely that they, "having each individually been convicted of a crime punishable by impris-onment for a term exceeding one year, a felony, knowingly did possess firearms . . . [that] had previously been shipped and transported in interstate commerce" in violation of 18 U.S.C. § 922(g)(1). The indictment did not allege that they knew of their felon status at the time of their possession, though both stipu-lated at trial that they were in fact felons at the time of their arrest.

Days after his federal arrest, Burden admitted to the Louisiana Parole Board that he had violated the conditions of his state parole by possessing a firearm. That prompted Scott to file a severance motion, which the district court denied. Notwithstanding that denial, the court instructed the jury that it was not to consider Burden's admission as evidence against Scott.

At trial, evidence was presented establishing that the defendants, upon surrendering to the officers, had claimed that they had just been robbed of their clothing (presumably by the shooters). That jury failed to reach a verdict.

3

No. 19-30394

Before the second trial, the district court ordered that the parties obtain its prior approval before "mention[ing] or elicit[ing] any testimony" regarding the supposed robbery. No party objected; neither did any party proceed to seek such approval. The second jury thus heard nothing about the defendants' robbery-related statements. After receiving the court's instructions outlining the elements of the crime—including that "[t]he government must prove that the defendant knew that he possessed a firearm, but not that the defendant knew that he was a qualifying felon"—the second jury found both men guilty.

The final presentence reports ("PSRs") recommended finding that the defendants "used and possessed" the firearms "in connection with attempted first degree murder." Neither defendant objected to his PSR, whose findings the district court therefore adopted.

## III.

The appeal presents four broad issues: (1) the denial of Scott's motion for severance, (2) errors relating to the defendants' knowledge (or lack thereof) that they were felons at the time of the incident, (3) the district court's limitation on evidence or testimony regarding the defendants' robbery claims, and (4) the cross-reference to attempted first-degree murder at sentencing.

## A.

A criminal defendant enjoys "the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). There is, however, "a narrow exception to this principle: . . . [W]hen the facially incriminating confession of a nontestifying codefendant is introduced at [a] joint trial," it

No. 19-30394

is not enough for "the jury [to be] instructed to consider the confession only against the codefendant." *Id.* at 207. *See also Bruton v. United States*, 391 U.S. 123, 135–36 (1968).

Otherwise, "even if prejudice is shown . . . [Rule 14] leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* And generally speaking, "juries are presumed to follow [such] instructions." *Id.* at 540.

The district court denied severance. We review that denial for abuse of discretion. *See id.* at 541. That review is "exceedingly deferential," requiring that "[t]he appellant [ ] show that (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration." *United States v. Xie*, 942 F.3d 228, 240–41 (5th Cir. 2019) (quotation marks omitted).

Scott, for his part, recognizes the herculean nature of his task. He "acknowledges the challenge he faces with the Supreme Court['s] holding [in *Marsh*, 481 U.S. at 211, that] 'the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.'" Such redaction did occur, Scott concedes: "Burden's statement did not mention Scott, and other

5

evidence was [indeed] needed to show the linkage to [Scott]."

Scott would have us nevertheless hold that the district court abused its discretion. Although Burden's redacted statement made no mention of Scott, "the effort needed to" link the statement to Scott "was slight, and the prejudice was great, since the whole focus of the Government's case was that only two shooters were involved, and the only two shooters were the defendants on trial." And the jury instruction not to consider Burden's statement as evidence against Scott "was equivalent to asking the jurors not to look at the proverbial pink elephant, inevitably the other defendant before them."[2]

That contention is without merit. "The key analytic factor in [*Marsh*] is that the statement did not clearly refer to the defendant and could only be linked through additional evidentiary material." *United States v. Powell*, 732 F.3d 361, 376–77 (5th Cir. 2013). Scott claims that Burden's statement should be distinguished because other evidence too easily allowed him to be linked to the statement, but "the source of the linking factors . . . [is not] significant. Rather, [*Marsh*] focuses on whether the statement facially implicates the defendant—or at least acknowledges the existence of another person. Here, [Burden's] statement[] do[es] not." *Id.* at 377.

Scott's true qualm is not with Burden's statement but with the mountain of other evidence against him. As Scott himself notes, "eyewitness and scientific evidence point[ed] to the two defendants on trial." Specifically, Barcelona testified to a belief that Scott and Burden were the shooters he witnessed; DNA evidence linked Scott to one of the masks and Burden to one of the firearms; and Scott and Burden were found together, first fully clothed, then partially

---

[2] By "not to look at the proverbial pink elephant," we assume that Scott is referring to a popular exercise in which one is challenged not to imagine a pink elephant, the point being that an instruction not to think of something all but ensures that the person will think of it.

naked less than a minute later. Any potential ease in linking Burden's statement to Scott arose not from the mere fact that they were tried together but because other evidence independently and overwhelmingly implicated Scott. That kind of linkage is not unduly prejudicial. *See United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017).

By stating that the limiting instruction was "equivalent to asking the jurors not to look at the proverbial pink elephant," Scott implicitly attacks the very legitimacy of limiting instructions. It might be, as Scott suggests, that instructing a jury not to consider certain testimony in fact highlights that testimony and, perversely, increases the odds that the jury should consider it. But we assume that juries can and do sort through complex issues.[3] In any case, "juries are presumed to follow their instructions." *Zafiro*, 506 U.S. at 540.[4] Scott has not overcome that presumption; the district court did not abuse its discretion.

## B.

After the convictions but before this appeal, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). It "held that the *mens rea* requirement in 18 U.S.C. § 924(a)(2)—'knowingly'—applies to both the 'conduct' and 'status' elements in § 922(g)." *United States v. Huntsberry*, 956 F.3d 270, 281 (5th Cir. 2020). "That is, the Government 'must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status [here, being a felon] when he possessed it.'" *Id.* (quoting *Rehaif*,

---

[3] *See Marsh*, 481 U.S. at 206 ("[It is an] almost invariable assumption of the law that jurors follow their instructions, which we have applied in many varying contexts.") (citation omitted).

[4] *See also Chapman*, 851 F.3d at 379 ("The defendant must [ ] show that the district court's instructions to the jury did not adequately protect him from any prejudice resulting from the joint trial." (ellipsis omitted)).

139 S. Ct. at 2194).

Both the government and the district court operated on the pre-*Rehaif* assumption that a conviction for firearms possession under 18 U.S.C. § 922(g)(1) need not require proof that the defendants knew they were convicted felons. Hence, (1) the indictment did not allege that they possessed such knowledge; (2) the government did not present any relevant evidence thereto; and (3) the court explicitly instructed that "[t]he government . . . [need] not [prove] that the defendant knew that he was a qualifying felon."

As it happens, the defendants also assumed that a conviction would not require a showing that they knew they were convicted felons. They did not object to the indictment's failure to allege subjective knowledge of their felon status; they did not suggest in their Rule 29 motion that the government's case should be dismissed for lack of proof suggesting subjective knowledge of the felonies; and they did not object to the relevant portion of the instructions. The defendants concede that their argument—at least regarding the indictment and instructions—is unpreserved and that, accordingly, the proper standard of review is plain error.[5]

It is unclear from their briefing whether the defendants' plain-error concession applies to their sufficiency-of-the-evidence claim. The government appears to accept that *de novo* review applies, and indeed this court has recently opined that "[w]e review the sufficiency of the evidence de novo . . . [if the defendant] made general objections to the sufficiency of the evidence." *United States v. Staggers*, No. 18-31213, 2020 U.S. App. LEXIS 18085, at \*14,

---

[5] Some circuits have held that *Rehaif* error is structural and therefore reversible even absent prejudice. *See, e.g.*, *United States v. Gary*, 954 F.3d 194, 203 (4th Cir. 2020). This circuit, however, has "held the opposite—that defendants must show that any error under *Rehaif* actually prejudiced the outcome." *United States v. Lavalais*, 960 F.3d 180, 184 (5th Cir. 2020).

No. 19-30394

961 F.3d 745, ___ (5th Cir. June 9, 2020).[6]  Because our disposition of the claim remains unaffected, we assume, *arguendo* only, that *de novo* review applies to the insufficiency claim.

1.

"Plain error requires that there was (1) error, (2) that is plain, and (3) that affects substantial rights."  *United States v. Anderton*, 901 F.3d 278, 282 (5th Cir. 2018) (quotation marks omitted).  If those conditions are met, this court "should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018).

The defendants have identified errors meeting the first two prongs.  "The district court's failure to instruct the jury concerning [the defendants'] knowledge of [their] felon status[es] was plainly erroneous," *Huntsberry*, 956 F.3d at 283, as was the government's "failure to inform [them] of the knowledge element as required in *Rehaif*," *Lavalais*, 960 F.3d at 187.  Our analysis thus turns to the third prong—whether the identified errors affected the defendants' substantial rights.

Under that prong, the defendant[7] bears the burden to "demonstrate 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'"  *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)).  "The probability of a different result must be

---

[6] *But see Huntsberry*, 956 F.3d at 282 (applying plain-error review because "the objection targeted a different element of the charged crime: whether [the defendant] knowingly possessed the firearms, not whether he knew his felon status").

[7] The shifted burden is "one important difference" between harmless-error review of preserved errors and plain-error review of unpreserved errors:  In the latter cases, such as this one, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *United States v. Olano*, 507 U.S. 725, 734 (1993).

sufficient to undermine confidence in the outcome of the proceedings." *Hunts-berry*, 956 F.3d at 283. That standard, *i.e.*, "[d]emonstrating prejudice under *Rehaif*[,] will be difficult for most convicted felons for one simple reason: Convicted felons typically know they're convicted felons[,] [a]nd they know the Government would have little trouble proving that they knew." *Lavalais*, 960 F.3d at 184.

This case is a perfect illustration. Burden's arrest for felony possession "occurred only days [after he was] released on [his] first parole for simple robbery," and Scott had been paroled from a three-year suspended prison sentence for simple burglary only a few months earlier.[8] Moreover, both defendants stipulated at trial that they were felons. The notion that either was unaware, as of October 2017, that he had been convicted of a felony, or that the government would have been unable to prove it, is unrealistic.[9] Accordingly, the defendants cannot meet their burden to show that *Rehaif* error affected their substantial rights.

## 2.

In reviewing a sufficiency-of-the-evidence claim, we ask whether, based on the evidence presented at trial, any "reasonable jury 'could have found the essential elements of the crime beyond a reasonable doubt.'" *Staggers*, 2020 U.S. App. LEXIS 18085, at *19, 961 F.3d at ___ (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). That "familiar standard gives full play to the

---

[8] "[O]n plain error review, it is appropriate for us to judicially notice the facts of [the defendants'] prior felony conviction[s]." *Huntsberry*, 956 F.3d at 284. And even if we are limited to the facts presented to the jury at the third prong of the plain-error analysis, there is no doubt that, under the fourth prong, we can rely on the entire record before us. *See Staggers*, 2020 U.S. App. LEXIS 18085, at *17, 961 F.3d at ___.

[9] *See Huntsberry*, 956 F.3d at 286 ("Taken together with his stipulation, these facts lead us to conclude that [the defendant] could not have been ignorant of his status as a convicted felon at the time the firearms were found in his possession.").

responsibility of the [jury] fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  In any case, the question is not "whether [we] believe[] that the evidence at the trial established guilt beyond a reasonable doubt . . . but whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational [jury] could have" found such guilt established. *Id.*

The only evidence relating to whether the defendants knew that they were convicted felons at the time of their arrests was the stipulation at trial that they were in fact convicted felons.  Although that stipulation alone does not necessarily place the question entirely beyond debate, "absent any evidence suggesting ignorance, a jury applying the beyond-a-reasonable-doubt standard *could* infer that [the] defendant[s] knew that [they were] convicted felon[s] from the mere existence of [their] felony conviction[s]." *Staggers*, 2020 U.S. App. LEXIS 18085, at \*20, 961 F.3d at ___ (emphasis added).  Therefore, regardless of the standard of review, the evidence was sufficient to support the conviction.

C.

When discovered by police, the defendants stated that they had just been robbed of their clothing.  For the second trial, the district court ordered the attorneys to seek approval before mentioning or eliciting testimony concerning those statements.  That requirement, defendants contend, inhibited their ability to present a "plausible defense" and constitutes plain error.

"[A] district judge has broad discretion in managing his docket, including trial procedure and the conduct of trial." *United States v. Gray*, 105 F.3d 956, 964 (5th Cir. 1997).  "In reviewing a district judge's trial procedure and conduct of the trial, we ordinarily determine whether the cumulative effect of the

judge's actions amount to an abuse of discretion." *Id.* Even an abuse of discretion, however, would not itself be enough to reverse or vacate the verdict in this case: "[B]ecause appellants never objected to the court's actions during trial, our appellate review is confined to the plain error standard" described above. *Id.*

The defendants spill much ink explaining why, if they had attempted to introduce evidence or elicit testimony relating to the supposed robbery, it should have been properly admitted under an exception to hearsay. That line of reasoning, as the government correctly notes, entirely misses the point: The district court never prevented the defendants from presenting such evidence but only instituted a procedure for such presentation. The proper analysis therefore focuses not on whether the evidence was admissible but on whether the procedure to determine its admissibility was an abuse of discretion (which, in turn, constitutes plain error). *See id.*

The defendants cannot begin to demonstrate such abuse. The relevant order specified, solely, "that no party [should] mention or elicit any testimony about defendants' claims that they were the victims of an armed robbery on the night of the alleged incident without prior approval of the [district] Court." The defendants never sought such approval, so we can only speculate as to how the court might have ruled or to what further procedure, if any, would have been required beyond making the request itself. The court's "procedure[]"— *i.e.*, that a party submit a request for prior approval—was "adequate on [its] face, and without trying [it], [the defendants] can hardly complain that [it would] not [have] work[ed] in practice." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009).

The defendants would have us nevertheless proceed as though the district court's procedural order were effectively a substantive ruling in their

disfavor. They write that, "at the unrecorded status conference . . . , the judge was abundantly clear: he was not going to allow it. . . . We [therefore] deemed it would have been futile to have attempted to raise the issue." Whatever the value of form, "the real world situation facing counsel," they say, was that "[t]he Court had ruled."

It is not, however, "elevating form over function" (defendants' words) to note the distinction between a court's hypothetical, expected, or even likely ruling and an *actual* one. It might be that counsel's intuitions were correct and the court would have withheld its approval inevitably.[10]  But absent even a cursory request, the defendants ask us to hold that the court abused its discretion by perhaps intimating that it would likely refuse counsel's request. We decline. The defendants (in their reply briefing) ultimately acknowledge the futility of their position, writing that "[i]f the defendants must suffer the consequences of counsel not preserving the ability to present such a defense by requesting a [Federal Rule of Evidence] 104(a) preliminary determination of admissibility during the trial, so be it." The district court did not err, much less plainly so.

## D.

At sentencing, the district court adopted an uncontested PSR cross-referencing of the firearms possession with attempted first-degree murder. Defendants contend that the facts at trial do not establish that attempt, so the court plainly erred.

In finding that the defendants attempted first-degree murder, the district court necessarily found, as relevant here, that their actions were "willful,

---

[10] Even then, it would have been wise to make the futile attempt and preserve the objection.

deliberate, malicious, and premeditated." 18 U.S.C. § 1111(a). "Although . . . deliberation and premeditation . . . involve[s] a prior design to commit murder, no particular period of time is necessary for such deliberation and premeditation[,] . . . [just that] [t]here must be some appreciable time for reflection and consideration before execution of the act . . . ."[11]

Ordinarily, a "factual finding[] [is] reviewed for clear error." *United States v. Barfield*, 941 F.3d 757, 761 (5th Cir. 2019). "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *Id.* "Th[is] Court will find clear error only if a review of all the evidence leaves [it] with the definite and firm conviction that a mistake has been committed." *Id.* at 761–62 (quotation marks omitted).

Because the defendants did not preserve the error, we would have the discretion to grant relief only if the clear error should constitute plain error. The Supreme Court has recently abrogated this circuit's "outlier [former] practice of refusing to review certain unpreserved factual arguments for plain error." *Davis v. United States*, 140 S. Ct. 1060, 1061 (2020) (abrogating *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991) (per curiam)). Thus, this court is to consider the defendants' unpreserved challenge as it would any other. *See id.* at 1061–62.

The defendants claim that "no evidence was presented at trial, either direct or circumstantial, that could reasonably lead to a conclusion that the act was premeditated." They note that the evidence establishes merely that "[t]wo men exited the[ir] SUV and opened fire on the occupants of the Mercedes" that had stopped behind them while they themselves were at a stop sign. Because

---

[11] *United States v. Shaw*, 701 F.2d 367, 392–93 (5th Cir. 1983), *abrogated on other grounds as recognized in United States v. Gurrola*, 898 F.3d 524, 537 n.31 (5th Cir. 2018).

"[b]oth the driver and the passenger of the Mercedes denied any knowledge of who shot at them," defendants suggest, the record shows that "the shooting . . . was a spur of the moment crime of convenience, rather than any deliberate, considered murder plot." It would have been rather "convenient" indeed that the shooters possessed not only two fully loaded, high-powered[12] firearms but also two black plastic masks,[13] that they happened to be wearing when they decided, apparently unprovoked and on the "spur of the moment," to exit their vehicle and fire nineteen rounds into the victims' occupied Mercedes.[14]

Defendants have shown, at most, that the shooters might not have held a "deliberate, considered, murder plot" specifically to kill the persons who were occupying the Mercedes. In that sense, it might have been "convenient" that the Mercedes and its occupants happened to stop behind the shooters' vehicle. It might be true that the shooters cared not for the identity of the Mercedes's occupants; perhaps they would have opened fire on *anyone* unlucky enough to have found themselves behind the shooters' SUV. And, had no such person arrived, it is perfectly plausible that the shooters would not have attempted to kill anyone at all.

But all that is entirely irrelevant. "Perhaps the best that can be said of deliberation is that it requires a 'cool mind' that is capable of reflection, and of premeditation that it requires that the one with the 'cool mind' did, in fact,

---

[12] Barcelona testified that one of the shooters' weapons was "a very high caliber rifle" that would penetrate even his armored police car, let alone an ordinary automobile.

[13] We note that the incident took place in October 2017, long before the current viral pandemic that might lend more plausibility to the notion that one in the shooters' position might have been wearing a mask coincidentally.

[14] *See Trottie v. Stephens*, 720 F.3d 231, 246, 250 (5th Cir. 2013) (stating that, although "Trottie argue[d] that . . . evidence [] would have undermined the jury's conclusion that he premeditated the murders," "the state presented evidence that Trottie [] wore a ski mask, which greatly undermines [that argument]").

reflect, at least for a short period of time before his act of [attempted] killing."[15] That "period of time 'does not [necessarily] require the lapse of days or hours[,] or even minutes.'"[16]

The record supports the finding that the shooters coolly reflected on their actions before taking them. As the defendants themselves note, there is no evidence that the shooters and the victims had ever previously interacted or known of the other's existence; in other words, nothing suggests the shooters were in a state of provocation that might have denied them the ability to reflect on their actions. Neither is there any evidence that the defendants are or were fundamentally incapable of such reflection. Even if there were no grand plot to murder specifically the persons occupying the Mercedes, there was ample opportunity to appreciate the situation while readying and wielding the guns, donning the masks, exiting the SUV, walking to the Mercedes, and opening fire repeatedly. That time was enough, and, again, that they "wore . . . mask[s] . . . greatly undermines" the notion that their actions were not premeditated. *Trottie*, 720 F.3d at 250.

The district court did not err.[17] The judgments of conviction and sentence are AFFIRMED.

---

[15] *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983), *abrogated on other grounds as recognized in United States v. Gurrola*, 898 F.3d 524, 537 n.31 (5th Cir. 2018) (citing WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., CRIMINAL LAW 563 (1972)).

[16] *Id.* (quoting *Bostic v. United States*, 94 F.2d 636, 639 (D.C. Cir. 1937)).

[17] It follows that, absent error, there cannot be plain error.